## STATE OF CONNECTICUT *v.* BARRY GUESS
### (SC 15723)

Callahan, C. J., and Borden, Berdon, Norcott and Katz, Js.

Argued March 17—officially released May 26, 1998

*Elizabeth M. Inkster*, assistant public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Elpedio Vitale* and *Mary H. Lesser*, assistant state's attorneys, for the appellee (state).

*Opinion*

KATZ, J. The sole issue on appeal is whether the term "death," as used in the Penal Code, may be construed to embrace a determination, made according to accepted medical standards, that a person has suffered an irreversible cessation of all brain functions.

The defendant, Barry Guess, was charged with murder in violation of General Statutes §§ 53a-8 and 53a-54a (a),[1] and with carrying a pistol without a permit in

---

[1] General Statutes § 53a-54a provides in pertinent part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

violation of General Statutes § 29-35.[2] After a trial by jury, he was found guilty of both counts, and was sentenced to an effective term of fifty years incarceration. Thereafter, he appealed to the Appellate Court raising, inter alia, the issue of whether, because the victim's life support systems had been disconnected after he had been shot by the defendant, the evidence presented was insufficient to support a finding of probable cause for the crime of murder.[3] The Appellate Court disagreed, concluding that the proximate cause of the victim's death was the bullet wound he had sustained, and the

[2] General Statutes § 29-35 provides in pertinent part: "Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States, or to any person carrying a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person carrying an antique pistol or revolver, as defined in section 29-33. . . ."

[3] Although the defendant has focused only on the definition of "death" at the probable cause hearing, the same question clearly would have applied to the defendant's trial had he focused the issue in those terms.

act of disconnecting the life support systems after the victim had been declared brain dead was a medically reasonable act that neither caused the victim's death nor constituted a sufficient intervening cause so as to negate the defendant's acts as the cause of death. *State* v. *Guess*, 44 Conn. App. 790, 800, 692 A.2d 849 (1997).

Thereafter, we granted the defendant's petition for certification as to the following issue: "Did the Appellate Court properly uphold the defendant's conviction of murder when Connecticut has not adopted the Uniform Determination of Death Act?" *State* v. *Guess*, 242 Conn. 902, 679 A.2d 688 (1997). As an alternate ground for affirmance the state argued: "[i]f the Appellate Court improperly upheld the defendant's conviction of murder because Connecticut has not adopted the Uniform Determination of . . . Death Act, did the Appellate Court properly uphold the conviction of murder because the removal of the life support mechanisms was not a sufficient intervening cause to preclude the defendant's liability for the murder of the victim." We conclude as a matter of common law that death as used in the Penal Code includes an irreversible cessation of the functioning of the brain and, accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court opinion sets forth the pertinent facts. "During the early morning of March 1, 1992, the defendant and two friends, Michael McCrea and Lamont Green, visited a convenience store in their neighborhood in New Haven. While inside the store, they encountered the victim, Melvin McCoy, and his friend, Germaine Young. The defendant knew the victim because the defendant was then dating Mary Streater, who had had a child with the victim.

"The two groups stared at each other in the store without exchanging any words. The victim and Young left the store and got into the victim's car, with the

victim in the driver's seat. Before pulling away from the curb, Young noticed the other three men leave the store and cross the street. The defendant and McCrea stayed near the intersection, while Green headed up the street. The victim drove the car toward where the two men were walking. Young saw the defendant begin to pull out of his pocket what Young recognized to be the handle of a black pistol. Young ducked down in the car and yelled to the victim to do the same. Young remained in that position while he heard about fifteen to twenty gun shots. After the shots were over and the car had rolled to a stop, Young looked out of the rear of the car to see two men running away. Young called to the victim, who did not respond. The victim was bleeding from his head.

"Young got out of the car and ran to a nearby house. He asked the resident to call an ambulance. Then Young called the victim's mother and told her that the victim had been shot by the defendant. Young went outside and saw Officer Michael Quinn, whom he knew from his neighborhood. Quinn noticed that Young was frantic and shaking. Young told Quinn, 'They shot Mel. They shot Mel. . . . Barry did it. Barry did it.' Young also spoke with another police officer, Officer Marcus Pisciotti, at the scene." *State* v. *Guess*, supra, 44 Conn. App. 792–93.

"Evidence was presented at the probable cause hearing by Joseph Piepmeier, the neurosurgeon at Yale New Haven Hospital who had treated the victim the morning of the shooting. Piepmeier testified that the victim arrived at the hospital at 1:59 a.m. in a coma with a heart rate of forty and no respiratory function. There was no evidence of brain stem function. According to Piepmeier, '[b]rain stem activity or brain stem function deals with the very basic functions of survival such as integration of movement, swallowing, breathing, controlling heart rate and blood vessels, controlling lung

function, controlling how your gut works. . . . [T]he very basic things that physiologically make us work [are] in the brain stem.'

"After the victim was intubated and put on a ventilator and respirator, his heart rate and blood pressure rose. He could not breathe on his own. After a while, there were discussions with the victim's family regarding disconnecting the ventilator or respirator. At about 9:30 a.m., a test was performed to determine if the victim could breathe on his own, and it was determined that he could not. His heart could not beat on its own without life support systems. According to Piepmeier, the victim was brain dead because there was no evidence of any brain activity. He went on to testify that 'any death, any death, regardless of mechanism, involves a cessation of brain activity. Death, in my estimation can only occur one way, one final common pathway, and that is the cessation of brain activity, regardless of what the heart's doing or the kidneys are doing, the lungs are doing, it's immaterial. Death is defined as an event in the brain.' After a question regarding the maintenance of body functions through mechanical means, Piepmeier responded, 'You can be dead and through machines and medication have a beating heart and the machine blowing oxygen into your lungs and taking carbon dioxide away. . . . [I]t is possible for someone to be dead in a medical definition and to have machines and medications make their heart and lungs perform activities.' He also testified that a doctor could issue a notice of death for a person while life support systems continue in place, although the general practice is to wait until the machines have been disconnected. The victim's parents authorized that the machines be disconnected and the victim was pronounced dead." Id., 795–96.

On appeal to the Appellate Court, the defendant argued that, because the legislature had not adopted

the Uniform Determination of Death Act,[4] and because the legislature did not define death in the Penal Code to include brain death, the court, in determining who or what caused the victim's death, must use a common-law definition of death, which does not include brain death, but rather depends solely upon the cessation of circulatory and respiratory functions of the body.[5] On the basis of the evidence, the Appellate Court concluded that "because traditional principles of causation allow this defendant to be found guilty of murder despite the action of another of removing the victim from life support systems," it did not need to decide whether to adopt judicially in the criminal setting a definition of death that includes brain death. Id., 797.

In this certified appeal, the defendant again argues that because Connecticut did not adopt the Uniform Determination of Death Act and because the Penal Code does not expressly define death, we must use the common-law definition, which, according to the defendant, does not include brain death, to define the cause of death in this case. The defendant recognizes that Connecticut has enacted General Statutes § 19a-504a,[6]

[4] The Uniform Determination of Death Act (1980) § 1, provides: "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards."

[5] The term "death" is defined as "[t]he cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." Black's Law Dictionary (4th Ed. 1968).

[6] In 1984, Connecticut enacted Public Acts 1984, No. 84-261, §§ 1 and 2, now codified as General Statutes § 19a-504a, which provides: "Continuation or removal of life support system. Determination of death. (a) For the purpose of this section, 'life support system' means any mechanical or electronic device utilized by any medical facility in order to replace, assist or supplement the function of any human vital organ or combination of organs.

"(b) For purposes of making a determination concerning the continuation or removal of any life support system in a general hospital licensed under section 19a-491, an individual who has sustained either (1) irreversible cessa-

which contains language that is identical to the language of the uniform act; see footnote 4 of this opinion; but argues that § 19a-504a (b) relates, not to assessing criminal liability, but, rather, to how a licensed hospital may "mak[e] a determination concerning the continuation or removal of any life support system . . . ." He relies on the prefatory language of § 19a-504a, which limits the language governing the determination of death to those portions of the General Statutes dealing with public health and well-being and removal of life support systems.[7] According to the defendant, the fact that the

tion of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. Determination of death shall be made in accordance with accepted medical standards."

[7] General Statutes § 19a-570 provides: "Definitions. For purposes of this section and sections 19a-571 to 19a-580c, inclusive:

"(1) 'Life support system' means any medical procedure or intervention which, when applied to an individual, would serve only to postpone the moment of death or maintain the individual in a state of permanent unconsciousness. In these circumstances, such procedures shall include, but are not limited to, mechanical or electronic devices including artificial means of providing nutrition or hydration;

"(2) 'Beneficial medical treatment' includes the use of medically appropriate treatment including surgery, treatment, medication and the utilization of artificial technology to sustain life;

"(3) 'Terminal condition' means the final stage of an incurable or irreversible medical condition which, without the administration of a life support system, will result in death within a relatively short time, in the opinion of the attending physician;

"(4) 'Permanently unconscious' includes permanent coma and persistent vegetative state and means an irreversible condition in which the individual is at no time aware of himself or the environment and shows no behavioral response to the environment;

"(5) 'Health care agent' means an adult person to whom authority to convey health care decisions is delegated in a written document by another adult person, known as the principal;

"(6) 'Incapacitated' means being unable to understand and appreciate the nature and consequences of health care decisions, including the benefits and disadvantages of such treatment, and to reach and communicate an informed decision regarding the treatment;

"(7) 'Living will' means a written statement in compliance with section 19a-575a containing a declarant's wishes concerning any aspect of his health care, including the withholding or withdrawal of life support systems;

legislature knew of the number of states that had adopted the uniform definition of death but, neverthe-

"(8) 'Next of kin' means any member of the following classes of persons, in the order of priority listed: (A) The spouse of the patient; (B) an adult son or daughter of the patient; (C) either parent of the patient; (D) an adult brother or sister of the patient; and (E) a grandparent of the patient;

"(9) 'Attending physician' means the physician selected by, or assigned to, the patient and who has primary responsibility for the treatment and care of the patient."

General Statutes § 19a-571 provides: "Liability re removal of life support system of incapacitated patient. Consideration of wishes of patient. (a) Subject to the provisions of subsection (c) of this section, any physician licensed under chapter 370 or any licensed medical facility who or which withholds, removes or causes the removal of a life support system of an incapacitated patient shall not be liable for damages in any civil action or subject to prosecution in any criminal proceeding for such withholding or removal, provided (1) the decision to withhold or remove such life support system is based on the best medical judgment of the attending physician in accordance with the usual and customary standards of medical practice; (2) the attending physician deems the patient to be in a terminal condition or, in consultation with a physician qualified to make a neurological diagnosis who has examined the patient, deems the patient to be permanently unconscious; and (3) the attending physician has considered the patient's wishes concerning the withholding or withdrawal of life support systems. In the determination of the wishes of the patient, the attending physician shall consider the wishes as expressed by a document executed in accordance with sections 19a-575 and 19a-575a, if any such document is presented to, or in the possession of, the attending physician at the time the decision to withhold or terminate a life support system is made. If the wishes of the patient have not been expressed in a living will the attending physician shall determine the wishes of the patient by consulting any statement made by the patient directly to the attending physician and, if available, the patient's health care agent, the patient's next of kin, the patient's legal guardian or conservator, if any, and any other person to whom the patient has communicated his wishes, if the attending physician has knowledge of such person. All persons acting on behalf of the patient shall act in good faith. If the attending physician does not deem the incapacitated patient to be in a terminal condition or permanently unconscious, beneficial medical treatment including nutrition and hydration must be provided.

"(b) A physician qualified to make a neurological diagnosis who is consulted by the attending physician pursuant to subdivision (2) of subsection (a) of this section shall not be liable for damages or subject to criminal prosecution for any determination made in accordance with the usual and customary standards of medical practice.

"(c) In the case of an infant, as defined in 45 CFR 1340.15 (b), the physician or licensed medical facility shall comply with the provisions of CFR 1340.15 (b) (2) in addition to the provisions of subsection (a) of this section."

less, chose to include this prefatory language in § 19a-504a, is evidence that it did not intend to adopt the uniform act or apply that definition of death to other statutes, such as those in the Penal Code. Furthermore, the defendant argues that, by failing to provide a definition within the Penal Code, the legislature intended for courts to rely on the common-law definition of death then in existence.

The state argues in response that the legislature adopted a uniform definition of death to achieve uniformity in responding to the advances in medical technology and that the prefatory language should not be exaggerated in a way that undermines that intent. Based upon that assumption, the state contends, it is illogical to suppose that the legislature intended that the term "death" have different meanings in different contexts. Thus, in the state's view the fact that this statutory definition of death is contained in the health care provisions does not detract from its application to this case. The legislature defined death in the hospital setting because, in order to prosecute someone for causing the death of another by virtue of having rendered that person brain dead, a hospital determination of death is required. In other words, because emergency medical technicians cannot determine brain death, what constitutes death for purposes of deciding when death can be certified is *always* going to be decided in the context of a hospital environment. Therefore, according to the state the legislature adopted the uniform definition of death to address the only way that the question can legitimately arise. Moreover, the fact that the legislature neglected to add the same definition to the Penal Code should not be interpreted as a sign of its rejection, particularly when there is nothing to suggest that the legislature revisited the code when it adopted § 19a-504a. Finally, the state argues, the fact that the legislature did not amend the code to include a definition of

death to mirror that contained in § 19a-504a is a reflection of the legislature's judgment that, when it enacted § 19a-504a, it adopted a uniform definition of death for all purposes.

The state also argues that even if the court were to conclude that § 19a-504a does not control, this court can nevertheless judicially construe the term "death" in § 53a-54a to encompass a brain-based definition of death.[8] We agree with the state that the outcome in this case does not depend on whether we apply § 19a-504a to § 53a-54a.

Because the legislature did not provide a definition of death in the Penal Code, we interpret the term in accordance with its commonly approved usage. See General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language"). Therefore, even if we were to assume, without deciding, that the legislature did not adopt the Uniform Determination of Death Act, we can, as a matter of common-law adjudication, define that term in tandem with medical science and technology as they have evolved in recent years.[9]

We begin with the defendant's claim that this court has accepted a common-law definition of death that is limited to the cessation of the respiratory and circulatory systems, and that the legislature, in drafting the Penal Code without providing a statutory definition of death, intended that the common-law definition then

---

[8] In fact, the state argues that this court already has recognized that death includes brain death. See *State* v. *Carpenter*, 214 Conn. 77, 80, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992). The defendant points out, however, that the defendant in that case had not challenged whether the death had constituted a homicide. Id., 82.

[9] Therefore, we need not decide whether by enacting § 19a-504a, the legislature adopted the Uniform Determination of Death Act.

in existence apply. In other words, according to the defendant, by failing to define the term in the Penal Code, the legislature contemplated reliance on a common-law definition frozen in time.

Although death has typically been discussed in terms of cessation of the heart and respiratory systems, the defendant has pointed to no case, and we have found none, in which this court has *expressly* defined death in such terms. Perhaps the fact that death has not been legally defined merely reflects the fact that, until now, no reason existed for this traditional medical definition to engender legal controversy. Indeed, only recently have medical science and technology evolved to the point where a person's heartbeat and respiration may be sustained mechanically even in the face of an irreversible loss of all brain functions, and where machines that artificially maintain cardiorespiratory functions have come into widespread use.

"Traditionally, in criminal prosecutions for homicide, when the fact or time of death was at issue, the common law defined death as 'the cessation of life' and set a medical standard of the stoppage of the circulatory and respiratory systems." Annot., 42 A.L.R.4th 742, 745 (1985). According to pre-1960 medical standards, the cessation of life was determined by the stoppage of the circulatory and respiratory systems. Id. The criteria of the stoppage of the circulatory and respiratory systems were cast into flux as the medical community gained a better appreciation of human physiology. See Report of President's Commission for Study of Ethical Problems in Medicine and Biomedical and Behavioral Research on Defining Death, Medical, Legal and Ethical Issues in Determination of Death (1981). "These traditional legal rules on death became troubling during the 1960's, following medical advances in three areas: (1) improved organ transplant technology, creating a need for 'fresh' organs, (2) the ability of external respiratory

and circulatory machines to maintain these bodily functions artificially for longer and longer periods, and (3) the enhanced ability to detect and monitor brain activity." Annot., 42 A.L.R.4th, supra, 746. As a result, a new medical definition of "death" centering on brain activity was developed.

The criteria by which the medical community determines brain death, first established in 1968 by the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death (Harvard Committee), include: (1) a total lack of responsivity to externally applied stimuli; (2) no spontaneous muscular movements or respiration; and (3) no reflexes, as measured by fixed, dilated pupils and lack of ocular, pharyngeal and muscle-tendon reflexes. Additionally, the Harvard Committee emphasized that these tests could be confirmed by a flat or isoelectric electroencephalogram reading, that the tests should be conducted twenty-four hours apart, and that hypothermia or the use of central nervous system depressants should be excluded as causative factors. Harvard Committee, "A Definition of Irreversible Coma," 205 JAMA 337 (1968); M. Victor, "Brain Death: An Overview," 27 Med. Trial Tech. Q. 37, 56–58 (1980).

This evolution in medicine has spawned concomitant developments in the law. In 1970, Kansas became the first state to adopt by statute a brain-based definition of "death." Kan. Stat. Ann. § 77-202 (1970); State v. Shaffer, 223 Kan. 244, 574 P.2d 205 (1977). After other states followed with their own variations, the National Conference of Commissioners on Uniform State Laws approved a Uniform Brain Death Act.[10] Then, in 1980,

---

[10] The Uniform Brain Death Act (1978) § 1, provides: "For legal and medical purposes, an individual who has sustained irreversible cessation of all functioning of the brain, including the brain stem, is dead. A determination under this section must be made in accordance with reasonable medical standards."

the National Conference of Commissioners on Uniform State Laws, in concert with the American Medical Association and the American Bar Association, drafted the Uniform Determination of Death Act, which created alternative standards for determining death: either the traditional irreversible cessation of circulatory and respiratory functions, or the irreversible cessation of all functions of the entire brain including the brain stem, "a determination to be made in accordance with accepted medical standards." Annot., 42 A.L.R.4th, supra, 747; see footnote 4 of this opinion; Harvard Committee, supra, 237 JAMA 982 (brain death is permanent cessation of all brain functions; unless sustained by mechanical support, cessation of somatic functions follows inevitably from this condition); see also *Lovato* v. *District Court,* 198 Colo. 419, 433, 601 P.2d 1072 (1979) (adopting brain death standard in addition to death as traditionally defined); *Commonwealth* v. *Golston,* 373 Mass. 249, 257, 366 N.E.2d 744 (1977), cert. denied, 434 U.S. 1039, 98 S. Ct. 777, 54 L. Ed. 2d 788 (1978) (jury instruction that brain death satisfies element of crime requiring proof of death properly incorporated significant technological advances); *In re Quinlan,* 70 N.J. 10, 18, 355 A.2d 647, cert. denied, 429 U.S. 922, 97 S. Ct. 319, 50 L. Ed. 2d 289 (1976) (granting father's request to be appointed guardian of comatose daughter to exercise on her behalf constitutional right of privacy to decline medical treatment); *In re Bowman,* 94 Wash. 2d 407, 421, 617 P.2d 731 (1980) (providing for brain death standard in addition to circulatory and respiratory function standard to define death). Black's Law Dictionary also responded to the advances in medical science in 1979 when it included for the first time a definition of "brain death" that provides in pertinent part: "Characteristics of brain death consist of: (1) unreceptivity and unresponsiveness to externally applied stimuli and internal needs; (2) no spontaneous movements or

breathing; (3) no reflex activity; and (4) a flat electroencephalograph reading after 24 hour period of observation. . . ." Black's Law Dictionary (5th Ed. 1979). This definition, which long preceded the death of the victim in the present case, "counters the defendant's argument that our disposition is controlled by the traditional definition of death recognized in the Fourth Edition." *Swafford* v. *State*, 421 N.E.2d 596, 599 (Ind. 1981).

In other analogous areas of the law reasonable medical standards have, by and large, controlled our decisions. See *State* v. *Garcia*, 233 Conn. 44, 93–94, 658 A.2d 947 (1995), on appeal after remand, 235 Conn. 671, 669 A.2d 573 (1996) (treatment of incompetency to stand trial with drug medication permitted where state demonstrated by clear and convincing evidence that, *to reasonable degree of medical certainty*, involuntary medication will restore defendant to competency); *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 705–706 n.13, 553 A.2d 596 (1989) (reliance on American Medical Association position that artificial nutrition and hydration of terminally ill patients constituted medical treatment that may be removed under some circumstances). When the legislature adopted the homicide statutes, it was also content to defer to the prevailing medical judgment as to the criteria by which to determine death. See Black's Law Dictionary (4th Ed. 1968) ("Death: The cessation of life; the ceasing to exist; *defined by physicians* as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." [Emphasis added.]).

This legislative deference does not mean, however, that it intended to freeze the definition of death at that point in time. " '[T]he common law of today is not a frozen mold of ancient ideas, but such law is active and dynamic and thus changes with the times and growth of society to meet its needs.' " *Swafford* v. *State*, supra,

421 N.E.2d 600. We have searched unsuccessfully for evidence that the legislature intended to render immutable the criteria by which to determine death. In the absence of any such indication, we are loath to limit the criteria to a fixed point in the past. "By extension, to hold to the contrary would be to say that the law could not recognize diagnostic equipment such as the stethoscope or more sensitive equipment even when it became clear that these instruments more accurately measured the presence of signs of life." *People* v. *Eulo*, 63 N.Y.2d 341, 356, 472 N.E.2d 286, 482 N.Y.S.2d 436 (1984).

It has not been the policy of this court to close its eyes to change or to disregard reality. See *Clohessy* v. *Bachelor*, 237 Conn. 31, 56, 675 A.2d 852 (1996) (recognizing cause of action for bystander emotional distress for person closely related to injury victim); *Burns* v. *Board of Education*, 228 Conn. 640, 649, 638 A.2d 1 (1994) (school children attending public schools during school hours intended beneficiaries of certain duties of care). "Principles of law which serve one generation well may, by reason of changing conditions, disserve a later one. . . . The adaptability of the common law to the changing needs of passing time has been one of its most beneficent characteristics." (Internal quotation marks omitted.) *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 196, 676 A.2d 831 (1996). "The flexibility and capacity of the common law is its genius for growth and adaptation." *State* v. *Dabkowski*, 199 Conn. 193, 199, 506 A.2d 118 (1986). As it has become "clear in medical practice that the traditional 'vital signs'— breathing and heartbeat—are not independent indicia of life, but are, instead, part of an integration of functions in which the brain is dominant"; *People* v. *Eulo*, supra, 63 N.Y.2d 352; our focus must shift from those traditional "vital signs" to recognize cessation of brain functions as criteria for death following this medical trend.

The question of when death has occurred carries significant legal ramifications including, but not limited to, issues of: inheritance; criminal and civil liability; termination of mechanical support; liability under insurance contracts; and exposure of physicians to medical malpractice claims. Although we are examining this issue in the context of a homicide, the defendant's position that we are wedded to a definition of death from the time the Penal Code was adopted juxtaposes uncomfortably with the medical community's capacity to sustain heartbeat and respiration through artificial means. The defendant acknowledges that brain death became the medically accepted standard for determining death some time ago. See J. Podgers, "Brain Death Concept Gaining Acceptance," 66 A.B.A.J. 272 (1980); D. Horan, "Definition of Death: An Emerging Consensus," 16 Trial 22 (1980); National Institute of Neurological and Communicative Disorders and Stroke, "An Appraisal of the Criteria of Cerebral Death: A Summary Statement," 237 JAMA 982 (1977). Furthermore, there is little disagreement with respect to the criteria by which the medical community determines brain death. Just as subsequent studies confirming the validity of the Harvard Committee criteria and suggesting refinements in its application have been conducted; National Institute of Neurological and Communicative Disorders and Stroke, supra, 982; see also M. Victor, supra, 27 Med. Trial Tech. Q. 55–56 (Association of Illinois Transplant Surgeons, Guidelines and Procedures for Organ Donation and Transplantation); so will continued research and study of brain death inevitably lead to further refinements and sophisticated techniques to aid in its determination. This continuing evolution in the science of determining brain death would be lost were we to adopt the defendant's position that we are wedded to a definition of death that existed when the Penal Code was enacted but that has been abandoned long ago by the

medical profession. In the absence of an overwhelming impediment, reasonable evolving medical standards must continue to play a dominant role.[11]

We also reject the defendant's contention that only the legislature can determine whether brain death should be recognized in law. The legislature clearly has the authority to define by statute the standards by which a hospital may determine death. See General Statutes § 19a-504a. We are, however, confident in our parallel authority, as a matter of common law, to determine what constitutes death and to embrace the advances made in medical science and technology during the last three decades. See, e.g., *Jolly, Inc.* v. *Zoning Board of Appeals*, supra, 237 Conn. 196; *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, supra, 209 Conn. 705–706 n.13.

Furthermore, the question of whether we should define death to include brain death is not foreclosed by our Penal Code. Although a definition of death "does not appear in haec verba in the penal code, that lacuna is not determinative in this case, because [General Statutes] § 53a-4 of the code provides: 'The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions.' The official commentary to that provision states: 'The purpose of this savings clause is to make clear that the provisions of [General Statutes §§] 53a-5 to 53a-23, which define the principles of criminal liability and defenses, are not necessarily exclusive. A court is not

---

[11] We note that several other jurisdictions, faced with the changes in medicine, chose judicially to adopt a brain death standard in homicide cases. See *State* v. *Fierro*, 124 Ariz. 182, 603 P.2d 74 (1979); *People* v. *Driver*, 62 Ill. App. 3d 847, 379 N.E.2d 840 (1978); *Commonwealth* v. *Golston*, supra, 373 Mass. 249; *State* v. *Meints*, 212 Neb. 410, 322 N.W.2d 809 (1982); *State* v. *Watson*, 191 N.J. Super. 464, 467 A.2d 590, cert. denied, 95 N.J. 230, 470 A.2d 443 (1983); *People* v. *Eulo*, supra, 63 N.Y.2d 341.

precluded by sections 53a-5 to 53a-23 from recognizing other such principles and defenses not inconsistent therewith.' Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 1985) § 53a-4, p. 196." *State* v. *Walton*, 227 Conn. 32, 44–45, 630 A.2d 990 (1993).

We do not believe that adopting a brain death standard in homicide cases is inconsistent with any other principle of criminal liability stated in the Penal Code. On the contrary, by including a brain-based definition of death, we merely track medically acceptable standards, consistent with § 1-1 (a), which provides that words "shall be construed according to the commonly approved usage of the language . . . ." Bearing this in mind, we are reminded that statutory construction is not "a ritual to be observed by unimaginative adherence to well-worn professional phrases." F. Frankfurter, "Some Reflections on the Reading of Statutes," 47 Colum. L. Rev. 527, 529 (1947). "[F]ew words are so plain that the context or the occasion is without capacity to enlarge or narrow their extension . . . . This is particularly true when a word . . . must be applied under changed conditions . . . ." (Citations omitted; internal quotation marks omitted.) *People* v. *Eulo*, supra, 63 N.Y.2d 354. We conclude that there is no jurisprudential impediment to incorporating in the term "death," as a matter of common law, the concept of brain death.

Moreover, although we do not decide the issue of whether § 19a-504a applies directly to the Penal Code, we can look to statutory policy to shape the common law. "We have on occasion looked to statutes as a source of policy for common-law adjudication, particularly where there is a close relationship between the statutory and common-law subject matters. See *Fahy* v. *Fahy*, 227 Conn. 505, 514–16, 630 A.2d 1328 (1993)." *Newman* v. *Newman*, 235 Conn. 82, 100, 663 A.2d 980

(1995); accord *New England Savings Bank* v. *Lopez*, 227 Conn. 270, 281, 630 A.2d 1010 (1993); *Hamm* v. *Taylor*, 180 Conn. 491, 495, 429 A.2d 946 (1980); *Canton Motorcar Works, Inc.* v. *DiMartino*, 6 Conn. App. 447, 453, 505 A.2d 1255, cert. denied, 200 Conn. 802, 509 A.2d 516 (1986). We consider the present case to provide an appropriate opportunity for this court to use § 19a-504a as a useful source of policy.

The close relationship between death as treated in the Penal Code and death as defined in § 19a-504a is obvious. Additionally, § 19a-504a reflects the legislature's recognition of the need to achieve uniformity and to account for advances in medical technology. 27 S. Proc., Pt. 3, 1984 Sess., p. 1081, remarks of Senator Howard T. Owens, Jr. To be consistent with that intent and to strengthen the legislative purpose of § 19a-504a, both provisions should be treated alike, and in fact, governed by the same medically acceptable standards. Moreover, where possible, courts should, as a matter of common-law adjudication, "assure that the body of the law—both common and statutory—remains coherent and consistent. *Fahy* v. *Fahy*, supra, 227 Conn. 513–14." (Internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 586, 657 A.2d 212 (1995). Therefore, against the backdrop of § 19a-504a, and consistent with the policies behind its enactment, we judicially construe the meaning of "death" as that term is used in the Penal Code to include a brain-based definition of death.

We conclude that our recognition of brain-based criteria for determining death is not unfaithful to any prior judicial determinations. "Death remains the single phenomenon identified at common law; the supplemental criteria are merely adapted to account for the 'changed conditions' that a dead body may be attached to a machine so as to exhibit demonstrably false indicia of life. It reflects an improved understanding that in the

complete and irreversible absence of a functioning brain, the traditional loci of life—the heart and the lungs—function only as a result of stimuli originating from outside of the body and will never again function as part of an integrated organism." *People* v. *Eulo*, supra, 63 N.Y.2d 356. Because the trial court at the hearing in probable cause reasonably found that the defendant's act of shooting the victim caused extensive brain damage, leaving the victim with no evidence of brain function, the court properly found that the state had established probable cause to charge the defendant with the crime of murder.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.