STATE OF CONNECTICUT *v.* RICARDO COLLINS
(AC 26511)

Flynn, C. J., and Rogers and Pellegrino, Js.

Argued October 27, 2006—officially released May 1, 2007

*Richard W. Callahan*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C.*

*Benedict*, state's attorney, and *Howard S. Stein*, assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, J. The defendant, Ricardo Collins, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (3),[1] carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a)[2] and using a firearm in the commission of a class B felony in violation of General Statutes § 53-202k.[3] He claims on appeal that the trial court improperly (1) instructed the jury on the element of causation in connection with the charge of assault in the first degree and (2) allowed the state to submit into evidence a photographic array of police mug shots. We affirm the judgment of the trial court.

[1] General Statutes § 53a-59 (a) provides in relevant part that "[a] person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

[2] General Statutes § 29-35 (a) provides in relevant part that "[n]o person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[3] General Statutes § 53-202k provides in relevant part that "[a]ny person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm . . . shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony." Assault in the first degree is a class B felony. See General Statutes § 53a-59 (b).

The defendant was acquitted on a charge of assault in the first degree in violation of § 53a-59 (a) (5). He was sentenced to twenty years imprisonment on the charge of assault in the first degree in violation of § 53a-59 (a) (3) and five years imprisonment on the charge of carrying a pistol or revolver without a permit in violation of § 29-35 (a), to run concurrently, and received a five year sentence enhancement, to run consecutively, for using a firearm in the commission of a class B felony in violation of § 53-202k.

The jury reasonably could have found the following facts. On the afternoon of August 28, 2002, the defendant was walking near the intersection of Pembroke and Jane Streets in Bridgeport. The victim, Stephen Rose, was driving by that intersection in his employer's vehicle when he saw the defendant. The victim was acquainted with the defendant, who is a cousin of the victim's then wife. The victim wanted to speak with the defendant because he believed that the defendant recently had stolen and crashed a new car that the victim had purchased for his wife.

The victim stopped his vehicle, exited it and called to the defendant. The victim confronted the defendant about the stolen car, and the defendant denied involvement. Further conversation ensued, and the dispute escalated. The two men were standing several feet apart when the defendant pulled a gun from the waistband of his pants. The victim raised his hands in the air but did not retreat to his vehicle, and he called the defendant a "bitch." The defendant began firing his weapon into the pavement on either side of the victim, shooting four times. The bullets ricocheted, striking a nearby residence and the vehicle driven by the victim. Thereafter, the victim lunged at the defendant in an attempt to tackle and disarm him. While the two men briefly were physically engaged, the defendant fired his weapon a fifth time. This gunshot entered the victim's elbow and lodged in his upper arm, causing serious injury.

The victim fell to his knee and clutched his wounded elbow. The defendant then struck the victim on the head with the butt of his weapon[4] and walked away. Emergency personnel arrived and transported the victim to the hospital where he underwent surgery to remove the bullet from his arm and received stitches to repair a cut on his head.

---

[4] We note that this conduct was not part of the charged offenses.

While the victim was hospitalized, he was visited by the police. He identified the defendant as the shooter and chose a photograph of the defendant from a photographic array. A warrant was issued for the defendant's arrest. After eluding the police for approximately four months, the defendant voluntarily submitted to arrest. Subsequent to receiving a *Miranda* warning[5] and signing a waiver of his rights, the defendant gave a statement in which he admitted shooting the victim, but characterized it as a defensive action taken in response to the victim's aggression.[6]

The defendant initially was charged in a three count information with assault in the first degree in violation

[5] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] The statement read in relevant part:

"Q. What do you have to tell me regarding the incident that occurred on August 28, 2002, on Pembroke Street?

"A. I was leaving my apartment on Pembroke Street . . . . I saw my cousin's husband, Steve. He was in a white livery cab, he was circling around and came back. He threw the car in park and ran up on me.

\* \* \*

"Q. Go on.

"A. He was yelling and screaming at me. He was accusing me of crashing his wife's car.

\* \* \*

"Q. OK, he's yelling at you and then?

"A. I was trying to walk away and he kept getting in my face. He took a swing at me. He hit me hard in the face.

"Q. What did you do after he hit you in the face?

"A. I had a gun on my side, so I shot him.

"Q. How many times did you shoot him?

"A. I don't know.

\* \* \*

"Q. Did any of the bullets hit him?

"A. At first I thought I didn't hit him, 'cause he went to hit me again.

"Q. Did you keep shooting?

"A. There were no bullets left.

"Q. And then?

"A. We were locked up, he still was swinging at me.

"Q. And then?

"A. I get him off me and then he said the cops were on their way. I just left."

of § 53a-59 (a) (5),[7] carrying a pistol or revolver without a permit in violation of § 29-35 (a); see footnote 2; and using a firearm in the commission of a class B felony in violation of § 53-202k. See footnote 3. In a subsequent amended information, the defendant was charged additionally with assault in the first degree in violation of § 53a-59 (a) (3). See footnote 1.

A jury trial was held on several days in October and November, 2004, after which the defendant was found guilty and sentenced as previously stated. This appeal followed. Additional facts will be provided where relevant to the claims raised.

I

The defendant claims first that the court improperly failed to charge the jury on the element of causation in connection with the charge of assault in the first degree. He refers to the lack of an instruction on probable cause and argues in particular that on the evidence presented, the court was obligated to give an instruction on the doctrine of intervening cause. We disagree.

The following additional procedural history is pertinent. At trial, the jury heard testimony from, inter alia, the victim, the defendant and two witnesses to the shooting. The witnesses, Anthony Brancato and Carlo Colonnello, were working on the third floor porch of a building near the scene of the events in question.

The victim testified that after the defendant fired the gunshots into the pavement, he lowered the gun, which the victim recognized as an opportunity to try and disarm the defendant. He stated that he tried to tackle the defendant, but was unsuccessful because at that point,

---

[7] General Statutes § 53a-59 (a) provides in relevant part that "[a] person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

the defendant "hit" him on the arm with the gun. The victim indicated that he was shot while in the process of physically engaging the defendant. Brancato and Colonnello confirmed that the victim was shot when he and the defendant were embraced. Neither Brancato nor Colonnello could provide any detail as to what the victim and the defendant were doing with their hands while the two men struggled.

The defendant took the witness stand in his defense and, throughout his testimony, repeatedly indicated that his actions on August 28, 2002, amounted to self-defense. He testified that the victim was bigger and stronger than he, and that he knew the victim to be a violent person. The defendant stated that the victim was very angry and threatening, and that the victim made the defendant nervous and fearful that something bad was going to happen. According to the defendant, he drew his weapon because he saw the victim reaching for his waist, causing the defendant to believe that the victim was armed. The defendant testified that he was trying to protect himself.

On cross-examination, the defendant testified that he believed he was in danger of death or great physical harm at the hands of the victim. Like the previous witnesses, he stated that the victim was shot as the two men struggled and the victim tried to disarm the defendant. According to the defendant, when the victim tried to take the gun, "I shot one off and it hit him right there." In response to further questioning, the defendant characterized the victim's injury as being the victim's own fault: "He got [himself] shot. He basically—yeah, he shot [himself] . . . because if he—if he hadn't been in that struggle, trying to struggle and take this gun away from me and twisting and turning, he wouldn't [have gotten] shot because I was never shooting at him."

On redirect examination, the defendant's counsel asked him what he had meant when he testified that

the victim had shot himself. In response, the defendant attempted to explain in detail what happened when he and the victim were physically engaged. In the course of this explanation, the defendant indicated that he squeezed the trigger of the gun because the victim, while attempting to get the gun, applied pressure to the defendant's hand.[8]

After evidence concluded, the court instructed the jury on each of the charged crimes and also on two lesser included offenses of assault in the third degree. See General Statutes § 53a-61 (1) and (2). It also gave a lengthy instruction on self-defense as a justification

---

[8] The transcript reflects the following colloquy between the defendant and his counsel:

"[Defense Counsel]: What do you mean by 'he shot himself'?

"[The Defendant]: I was saying the way he had—the way he was trying to control—take the gun because if he would never have been twisting on the gun like that and going back and forth, I don't think he—he wouldn't [have gotten] shot.

"[Defense Counsel]: Where was his hand or his hands with reference to your right hand at the time the shot went off?

"[The Defendant]: He was—he was trying to take the gun out my—it was on the butt and it was a—the—like he was—he had a whole lock on the gun, the butt.

"[Defense Counsel]: Let the record reflect that the witness is showing that the one hand is overlapping the other hand, at least in part.

"[Defense Counsel]: Could you—could you show to the jury how the hands were when the shot went off?

"[The Defendant]: It was like this. It was like this, and I was trying because I was trying to—I was just trying to keep the gun. I was just trying to keep the gun down. You know what I'm saying? Make sure I keep the gun at the same time because I [didn't] want him to take the gun away from me. I just was trying to maintain possession of the gun, keep it down. But he kept trying to take it and when he—when my—when my wrist got twisted in reverse, he was still squeezing and grabbing my hand and my finger that was already in the trigger, and he was like, pow, and he got hit on his arm.

"[Defense Counsel]: Why did the trigger—why did your finger squeeze the trigger?

\* \* \*

"[The Defendant]: Because he was squeezing my hand. He was squeezing my hand. He was trying to pry it out and he couldn't. He couldn't—couldn't—he couldn't get it because I had—I had—I had like a—I say I had—I thought I had a good grip on it, and I was just holding on the best I could. That's all."

for the various assault charges, as requested by the defendant. As to the charge of assault in the first degree in violation of § 53a-59 (a) (3), in regard to the element of causation, the court instructed the jury that the state needed to show that the defendant's conduct "caused [the victim] to suffer a serious physical injury."[9] Neither party requested a charge on proximate cause or the doctrine of intervening cause, and, accordingly, the court did not give one.[10] Following the jury charge, the defendant did not object to the court's instructions on the assault charges as they were given. He also did not take issue with a printed summary of the elements of all of the charged offenses that was provided to the jury, which also listed the element of causation, as to each assault charge, without reference to proximate cause or intervening cause.[11]

The defendant now claims that the court failed to instruct the jury properly on the assault charge of which he was convicted in regard to the element of causation. He argues that the court provided no instruction as to proximate cause and, more specifically, that his testimony on redirect examination raised the issue of whether the victim's injury was the result of an intervening cause such that a detailed charge on that doctrine also was warranted. Because his claim is unpreserved, the defendant requests that we review it pursuant to

[9] The court instructed the jury similarly as to the element of causation for the other count of assault in the first degree, in violation of General Statutes § 53a-59 (a) (5), and also for the two charges of assault in the third degree that were available as lesser included offenses.

[10] The state submitted a request to charge on, inter alia, the counts of assault in the first degree, and the defendant submitted a request to charge on, inter alia, the lesser included offenses of assault in the third degree. Each party's request lacked detailed causation instructions as to both assault counts addressed. The court's charge largely was consistent with the parties' requests.

[11] As to the assault charge of which the defendant was convicted, the outline instructed the jury to determine whether the defendant by his conduct "cause[d] serious physical injury to [the victim]."

the rule of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[12] or the plain error doctrine. See Practice Book § 60-5.[13]

The record affords an adequate basis for review, and the defendant raises a claim of constitutional magnitude. See *State* v. *Coleman*, 48 Conn. App. 260, 270, 709 A.2d 590 (1998) (court's failure to instruct adequately on essential element of crime implicates fairness of trial and may result in due process violation), aff'd, 251 Conn. 249, 741 A.2d 1 (1999), cert. denied, 529 U.S. 1061, 120 S. Ct. 1570, 146 L. Ed. 2d 473 (2000). The defendant, however, has not demonstrated that a constitutional violation clearly exists and clearly deprived him of a fair trial. His claim therefore fails.

The principles governing appellate review of challenged jury instructions are well settled. We do not critically dissect the charge in a search for possible inaccuracies, but rather, consider it as a whole to ensure that it fairly presented the case to the jury such that

---

[12] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. "*Golding*'s first two prongs relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." *State* v. *Miller*, 95 Conn. App. 362, 380 n.10, 896 A.2d 844, cert. denied, 279 Conn. 907, 901 A.2d 1228 (2006).

[13] "The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Martinez*, 95 Conn. App. 162, 170 n.5, 896 A.2d 109, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006). We conclude that plain error is not present in this case.

injustice was not done to either party under the established rules of law. See *State* v. *Gooden*, 89 Conn. App. 307, 312–13, 873 A.2d 243, cert. denied, 275 Conn. 918, 919, 883 A.2d 1249 (2005). Furthermore, we must determine whether the court's instructions "gave the jury a reasonably clear comprehension of the issues presented for [its] determination under the pleadings and upon the evidence and were suited to guide [it] in the determination of those issues." (Internal quotation marks omitted.) Id., 313; see also *State* v. *Flowers*, 69 Conn. App. 57, 71, 797 A.2d 1122 (instructions not considered in vacuum, but in context of factual issues raised at trial), cert. denied, 260 Conn. 929, 798 A.2d 972 (2002). Our focus is "on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial. . . . Moreover, as to unpreserved claims of constitutional error in jury instructions, we have stated that under the third prong of *Golding*, [a] defendant may prevail . . . only if . . . it is reasonably possible that the jury was misled . . . ." (Internal quotation marks omitted.) *State* v. *McArthur*, 96 Conn. App. 155, 176, 899 A.2d 691, cert. denied, 280 Conn. 908, 907 A.2d 93 (2006).

Causation is an essential element of assault in the first degree; see General Statutes § 53a-59 (a) (3); and, "[i]n order for legal causation to exist in a criminal prosecution, the state must prove beyond a reasonable doubt that the defendant was both the cause in fact, or actual cause, as well as the proximate cause of the victim's injuries."[14] (Internal quotation marks omitted.)

---

[14] "In order that conduct be the actual cause of a particular result it is almost always sufficient that the result would not have happened in the absence of the conduct; or, putting it another way, that 'but for' the antecedent conduct the result would not have occurred. . . . On the other hand, proximate cause requires that the forbidden result which actually occurs must be enough similar to, and occur in a manner enough similar to, the result or manner which the defendant intended (in the case of crimes of intention), or the result or manner which his reckless or negligent conduct

*State* v. *Guess*, 44 Conn. App. 790, 797–98, 692 A.2d 849 (1997), aff'd, 244 Conn. 761, 715 A.2d 643 (1998).

In *State* v. *Leroy*, 232 Conn. 1, 653 A.2d 161 (1995), a defendant who was charged, after an automobile collision, with assault in the second degree with a motor vehicle while intoxicated presented evidence showing that the victim had crossed the center line in the road and caused the collision. In addressing a challenge to the trial court's charge to the jury, our Supreme Court stated that "a jury instruction with respect to proximate cause must contain, at a minimum, the following elements: (1) an indication that the defendant's conduct must contribute substantially and materially, in a direct manner, to the victim's injuries; and (2) an indication that the defendant's conduct cannot have been superseded by an efficient, intervening cause that produced the injuries." Id., 13.

In a subsequent case, however, the court clarified that "the requirement of language in the jury instructions regarding an efficient, intervening cause is not ironclad. It arises in those cases in which the evidence could support a finding by the jury that the defendant's conduct was overcome by an efficient, intervening cause, or in which the evidence regarding proximate causation was such that, based on the doctrine of efficient, intervening cause, the jury could have a reasonable doubt about the defendant's guilt. Thus, in the general run of cases, in which the evidence is susceptible of a finding of only one cause of the harm contemplated by the statute, a statement in the jury instruction referring

---

created a risk of happening (in the case of crimes of recklessness and negligence) that the defendant may fairly be held responsible for the actual result even though it does differ or happens in a different way from the intended or hazarded result . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Guess*, 44 Conn. App. 790, 798, 692 A.2d 849 (1997), aff'd, 244 Conn. 761, 715 A.2d 643 (1998).

to an efficient, intervening cause might well be unnecessary." *State* v. *Munoz*, 233 Conn. 106, 121 n.8, 659 A.2d 683 (1995). In deciding *Munoz*, the court also took the opportunity to elaborate on the doctrine of intervening cause so as to provide guidance to trial courts for cases in which such a jury instruction is warranted.

The court explained: "The doctrine of intervening cause . . . refers to a situation in which the defendant's conduct is a 'but for' cause, or cause in fact, of the victim's injury, but nonetheless some other circumstance subsequently occurs—the source of which may be an act of the victim, the act of some other person, or some nonhuman force—that does more than supply a concurring or contributing cause of the injury, but is *unforeseeable* and sufficiently powerful in its effect that it serves to relieve the defendant of criminal responsibility for his conduct. . . . Thus, the doctrine serves as a dividing line between two closely related factual situations: (1) where two or more acts or forces, one of which was set in motion by the defendant, combine to cause the victim's injuries, in which case the doctrine will not relieve the defendant of criminal responsibility; and (2) where an act or force intervenes in such a way as to relieve a defendant, whose conduct contributed in fact to the victim's injuries, from responsibility, in which case the doctrine will apply." (Citations omitted; emphasis added.) Id., 124–25.

The defendant claims that the court, sua sponte, should have given the jury the two part proximate cause instruction outlined in *Leroy* and, further, that it should have provided additional elaboration on the doctrine of intervening cause as articulated in *Munoz*. According to the defendant, his testimony on redirect examination, in which he indicated that the victim caused his own injuries by applying pressure to the defendant's trigger finger, was an evidentiary basis requiring the court to give such an instruction. We disagree.

Our review of the jurisprudence concerning intervening cause in the criminal context demonstrates that the testimony highlighted by the defendant, even if credited by the jury, would not have provided adequate support for a finding that the defendant's conduct was not the legal cause of the defendant's injury. An intervening act may break the chain of legal causation when it is unforeseeable. See id., 124. Typically, however, when a purportedly intervening act is a response to a defendant's criminal actions or a reaction to the conditions created by the defendant, the act is deemed foreseeable and, therefore, will not serve to break the chain of legal causation so as to relieve the defendant of responsibility for the ultimate consequences of his actions. See 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 6.4 (f) (3), p. 482. Among the "most obvious illustrations" of such responses or reactions are the defensive or evasive actions of a victim facing potential harm. Id.; see also id., § 6.4 (f) (4), p. 483 ("impulsive acts [of a victim] to avoid harm are quite normal, and thus [the defendant] may be said to be the legal cause of the consequences").

Accordingly, in State v. Malines, 11 Conn. App. 425, 433, 527 A.2d 1229 (1987), this court rejected a defendant's claim that her victim's attempt to wrest a handgun from her, causing it to discharge a fatal gunshot, was an intervening cause that absolved her of responsibility for the victim's death. Prior to the victim's attempt, the defendant had waved the gun around, refused to relinquish it and threatened to shoot the victim and another individual. See id., 426–27. We were not persuaded by the defendant's claim that the victim's "allegedly reckless conduct . . . in an effort to retrieve the gun in effect broke a link in the chain of legal causation . . . ." Id., 432; see also State v. Kyles, 221 Conn. 643, 666 n.13, 607 A.2d 355 (1992) (robbery victim's struggle for gun foreseeable response to robbery situation);

*State* v. *Leopold*, 110 Conn. 55, 62, 147 A. 118 (1929) (tenants' entry into burning building to retrieve valuables, resulting in their deaths, natural and ordinary response to defendant setting fire).

The facts of this case are not distinguishable, in any meaningful way, from those of *Malines*. The defendant did more than threaten the victim with harm while merely brandishing a weapon; he fired four gunshots in the victim's general direction. The victim's impulsive reaction, to try and disarm the defendant when the opportunity presented itself, was a normal and foreseeable response to the dangerous situation created by the defendant and should not serve to relieve the defendant of criminal responsibility for the results of his reckless conduct. As such, the doctrine of intervening cause was not implicated, and the court's failure to charge the jury on that doctrine does not constitute a clear constitutional violation that clearly deprived the defendant of a fair trial.[15]

There remains the question of whether the court's failure to give any charge on proximate cause, i.e., not even the first part of the "minimum" proximate cause instruction outlined in *Leroy*, constitutes a clear constitutional violation that deprived the defendant of a fair trial. We conclude that under the facts and circumstances of this case, it does not. In determining whether

[15] We recognize that typically, the question of whether particular conduct amounts to an intervening cause is a factual one for a jury to resolve when the evidence presented, viewed most favorably to the defendant, justifies submission of the issue. See *State* v. *Munoz*, supra, 233 Conn. 125. "It becomes a question of law, however, when the mind of a fair and reasonable [person] could reach only one conclusion . . . ." (Internal quotation marks omitted.) *State* v. *Browne*, 84 Conn. App. 351, 367, 854 A.2d 13, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004); see, e.g., *State* v. *Lawson*, 99 Conn. App. 233, 242–43, 913 A.2d 494 (holding that evidence presented, viewed most favorably to defendant, did not warrant detailed instruction on intervening cause), cert. denied, 282 Conn. 901, 918 A.2d 88 (2007). We conclude that the evidence adduced in this case presents such a circumstance.

it is reasonably possible that the jury was misled by the court's instructions, we must consider the charge with reference to the entire trial and the issues raised therein. See *State* v. *Gooden*, supra, 89 Conn. App. 313; *State* v. *Flowers*, supra, 69 Conn. App. 71. So viewed, it is apparent that the issue of the cause of the victim's injuries essentially was undisputed such that the jury could not have been misled.

Our review of the entire record demonstrates that the defendant's theory at trial was not one of intervening cause, but rather self-defense.[16] That theory is evident from the evidence presented by the defendant, the questions his counsel posed to witnesses,[17] his closing argument and his request to charge the jury.[18] The defendant did not dispute that it was a bullet fired from the weapon he possessed that caused the victim's injury, and, although attempting to cast his actions as unintended

[16] Although a criminal defendant, as a matter of policy, is not precluded from simultaneously pursuing two or more inconsistent defenses; see *State* v. *Shabazz*, 246 Conn. 746, 764–65, 719 A.2d 440 (1998) ("defendant's presentation of inconsistent defenses may be self-penalizing . . . because it will . . . encourage jury skepticism about his entire defense" [citation omitted; internal quotation marks omitted]), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999); it is apparent that the defendant here adopted a more prudent trial strategy, consistent with his statement to police; see footnote 6; and focusing on self-defense alone.

[17] For example, when cross-examining the victim, defense counsel repeatedly attempted to get him to admit that he was angry, confrontational and threatening the defendant during the incident at issue. Defense counsel never asked the victim whether he applied pressure to the defendant's trigger finger.

[18] Although the defendant's request to charge addressed only the lesser included offenses of assault in the third degree, the issue of causation with respect to those offenses does not differ from the issue of causation in the context of the offense of assault in the first degree. As such, the defendant's submission of a request to charge on assault in the third degree that lacked any instruction on causation; see footnote 10; comes very close to implicating the doctrine of induced error, for which *Golding* review is unavailable. See *State* v. *Cruz*, 269 Conn. 97, 104, 848 A.2d 445 (2004). We nevertheless review the defendant's claim because, strictly speaking, he did not request the exact instruction of which he now complains. See id., 105–106.

and responsive to the victim's aggression, the defendant admitted, consistent with his statement to police, that he "shot one off and it hit [the victim]."

Under a theory of self-defense, a criminal defendant basically admits engaging in the conduct at issue, but claims that that conduct was legally justified. See General Statutes § 53a-19; see also *State* v. *Schultz*, 100 Conn. App. 709, 717, 921 A.2d 595 (2007) ("self-defense presumes an intentional but justified act"). Accordingly, in the context of a self-defense claim, there usually is no need for a detailed instruction on proximate causation. The court thus instructed the jury using the ordinary meaning of "cause." "[W]hen a word contained in an essential element carries its ordinary meaning, failure to give the [legal] definition will not constitute error. . . . Because a complex issue of causation was not present in this case, the use of the plain meaning of causation did not present a reasonable possibility that the jury was misled nor the defendant deprived of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Jenkins*, 40 Conn. App. 601, 606–608, 672 A.2d 969, cert. denied, 237 Conn. 918, 676 A.2d 1374 (1996).[19]

Although we are obligated to address the defendant's unpreserved claim of constitutional error under *Golding*, in so doing, we are not foreclosed from considering that his failure to take issue with a jury instruction was entirely consistent with his trial strategy, nor are we required to evaluate his claim in the context of a theory newly embraced on appeal. See *State* v. *Browne*, supra, 84 Conn. App. 383 n.22 ("Our appellate courts frequently

---

[19] See also *State* v. *Gooden*, supra, 89 Conn. App. 313 ("[a] jury instruction that improperly omits an essential element from the charge constitutes harmless error if a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error" [internal quotation marks omitted]).

have stated that a party may not pursue one course of action at trial for tactical reasons and later on appeal argue that the path he rejected should now be open to him. . . . *Golding* is not intended to give an appellant a second bite at the apple." [Citation omitted; internal quotation marks omitted.]). It is clear that the defendant, by focusing on a small portion of his own self-serving testimony elicited at the conclusion of his trial, is improperly attempting to inject an entirely new theory of defense into his case on appeal. On the basis of the foregoing analysis, the defendant's first claim fails.

## II

The defendant also claims that the court improperly allowed a photographic array of mug shots to be admitted into evidence. He argues that the array was irrelevant to the issues in the case and, further, that its admission was harmful. Although we agree that this evidence was of very limited relevance, we are not convinced that its admission prejudiced the defendant.

The following additional facts are pertinent. Following the shooting, Detective Erno Nandori of the Bridgeport police department was dispatched to the scene. Upon receiving information from his colleagues, he returned to the detective bureau and compiled a photographic array of eight mug shots that he thereafter took to Bridgeport Hospital, where the victim was being treated. The victim named the defendant as the shooter and identified his photograph from the array. The victim dated and signed the defendant's photograph to evidence that identification.

At trial, the victim testified about being visited by police at the hospital and identifying the defendant's photograph. Over the defendant's objection, the court allowed the state to introduce a redacted version of the photographic array that showed only the defendant's photograph and the victim's identifying writing under the caption, "Bridgeport Police Department." The court

reasoned that the photographic identification tended to show that the victim was certain of the identity of his assailant and was not overly prejudicial.

Thereafter, Nandori testified about his role in the investigation. He indicated that he compiled a photographic array and took it to the victim, who identified the defendant. Over the defendant's objection, the court allowed the state to introduce the unredacted version of that array that displayed all eight mug shots. The court accepted the state's contention that the array was relevant to show the general course of the police investigation and that it was not overly prejudicial. The defendant now claims error in the admission of both the redacted and unredacted versions of the array.

Our Supreme Court has cautioned against indiscriminate use of police mug shots during trials because they can imply prior arrests and reflect unfavorably on an accused person. See *State* v. *Pecoraro*, 198 Conn. 203, 205, 502 A.2d 396 (1985). Nevertheless, "[a] mug shot is admissible if it is relevant and material and if its probative value outweighs its prejudicial tendency. . . . The primary responsibility for conducting the prejudicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Harris*, 43 Conn. App. 830, 838, 687 A.2d 544 (1996). Moreover, even if a defendant can meet his burden of showing an improper exercise of that discretion, to constitute reversible error, he also must demonstrate that the evidentiary impropriety was harmful. Id., 839.

The defendant argues convincingly that his photograph, and the entire array, lacked relevance because his identity as a participant in the events of August 28, 2002, was not at issue. The victim and the defendant were acquainted prior to those events, and the victim apparently had identified the defendant as his assailant

prior to viewing the police photographs. Furthermore, the defendant did not dispute that he was the individual with the gun that wounded the victim; he contested only the circumstances surrounding the shooting. Compare *State* v. *Hoover*, 54 Conn. App. 773, 777–78, 738 A.2d 685 (1999) (police photographs relevant because identification contested).

Nevertheless, we are unable to conclude that the court's admission of the photographs is reversible error because the defendant has not shown that he was unduly prejudiced by the jury's viewing of them. The photographs did not include profile images or information relating to charges or convictions, and no placards or identification numbers were visible. "Concealment of any police markings . . . [mitigates] the prejudicial effect of the photograph." (Internal quotation marks omitted.) *State* v. *Ruffin*, 48 Conn. App. 504, 510, 710 A.2d 1381, cert. denied, 245 Conn. 910, 718 A.2d 18 (1998). Furthermore, the court during its charge to the jury gave a cautionary instruction directing the jurors not to draw negative inferences from the existence of a police photograph of the defendant,[20] lessening any potential for prejudice. See id., 512. We must presume, absent indications to the contrary, that the jury heeded the court's instructions. See *Edwards* v. *Commissioner of Correction*, 88 Conn. App. 169, 176, 868 A.2d 125, cert. denied, 273 Conn. 941, 875 A.2d 43 (2005). Accordingly, we are not persuaded that the result in this case would have differed had the photographs not been admitted. See *State* v. *Harris*, supra, 43 Conn. App. 839.

The judgment is affirmed.

In this opinion the other judges concurred.

[20] The court instructed: "There were some photographs of persons in this case. I just want to make a comment about the photographs that come from a police source. Simply because the police have a person's photograph does not mean that a person was ever arrested or convicted of a crime. No connotation of wrongdoing should apply to a person merely because the person's picture came from a police source."