# STATE OF CONNECTICUT *v.* JERMANO C. FLOWERS
## (AC 20578)
## (AC 20579)

Lavery, C. J., and Bishop and Daly, Js.

Argued January 17—officially released April 9, 2002

*David V. DeRosa*, special public defender, for the appellant (defendant).

*John A. East III*, assistant state's attorney, with whom, on the brief, was *Mary M. Galvin*, state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Jermano C. Flowers, appeals from the judgments of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), interfering with an officer in violation of General Statutes § 53a-167a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[1] The defendant claims that the court deprived him of his constitutional right to a fair trial by (1) failing to conduct an adequate voir dire, (2) precluding him from offering alibi witness testimony and (3) improperly instructing the jury. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On the evening of September 18, 1998, Jordan Welch returned after work to his home in West Haven.

---

[1] This case is the companion to *State* v. *Salmond*, 69 Conn. App. 81, 797 A.2d 1113 (2002).

A block party was in progress at a neighbor's house. Welch visited the party briefly, returned to his front porch and watched the nearby festivities while drinking beer in the company of his eleven year old son.

Within minutes, Welch saw a neighbor known to him as "Junkie Jay" emerge from the alley next to his house. Junkie Jay proceeded up the steps of Welch's porch while glancing to his side. Following Junkie Jay's eyes, Welch observed the defendant and his codefendant at trial, Teddy Salmond, standing together about ten feet away near the front of his porch. As Junkie Jay ascended the steps, he drew a silver or chrome handgun, pointed the gun at Welch and ordered him to surrender his gold chain and religious medallion. Welch told his son, who was standing in the doorway, to go into the house and close the door. Junkie Jay then snatched the chain and medallion from Welch's neck and departed down the steps.

Welch pursued Junkie Jay, but was accosted at the bottom of the steps by the defendant and Salmond. The two men grabbed Welch from the side and pulled him toward the alley. Both men, each wielding a black handgun, beat Welch about the head and attempted to rifle his pockets while Junkie Jay stood by and watched. The arrival of a police officer, Anthony Pacileo, caused Junkie Jay, the defendant and Salmond to flee.

Welch, who was bleeding from a head wound, described his three assailants to Pacileo. When backup officers arrived, they walked with Welch to the party site and surveyed the crowd. There, Welch identified Salmond, who was taken into police custody. A search of Salmond and the immediate area failed to produce the stolen articles or any weapons. Neither Junkie Jay nor the defendant was found that evening, and Welch never recovered the stolen medallion and chain.

The following morning, Welch was on his front porch when he observed the defendant's brother, Stephen Flowers, drive up in a vehicle and park it outside the Flowers residence adjacent to Welch's home. Both men made gestures toward each other and began to brawl on the sidewalk. During the fight, Stephen Flowers brandished a black handgun, and Welch retreated inside his home. Welch's wife, who had observed the fracas from inside the residence, called the police.

The police arrived at the scene shortly thereafter, and Flowers' mother consented to a search of the Flowers residence, where Stephen Flowers was apprehended. During the search, Officer Sean Faughnan was detailed to secure the rear yard, which was separated from the Welch yard by a fence. At one point, Faughnan looked through the slats of the fence and saw the defendant and another man cross the Welch yard and proceed toward the Welch residence. As the men approached the house, Faughnan observed the defendant withdraw a handgun from his waistband. Faughnan drew his own weapon, opened a gate in the fence and confronted both men from a distance of three to five feet. The defendant placed the handgun on the ground and the two men fled the area.

After securing the gun left by the defendant, Faughnan gave chase, directed, in part, by observant neighbors. Faughnan later discovered and apprehended the defendant, who kicked and spat at the officer while Faughnan was trying to secure him. The defendant subsequently was arrested and charged in connection with the robbery.

The court granted the state's motion to try the defendant and Salmond together. The jury found the defendant guilty of robbery in the first degree, carrying a pistol without a permit and interfering with an officer. The court sentenced the defendant to twenty-three

years incarceration, execution suspended after nineteen years, and four years probation. This appeal followed.

## I

The defendant first claims that the court improperly deprived him of his constitutional right to a fair trial when it failed to question adequately several prospective jurors who may have observed him in shackles. The defendant seeks review of his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

During jury selection, a clerk informed the court that she had noticed several panel members seated in the second row of the jury box "looking down" in the direction of the defendant's shackles. The clerk also stated that she thought she heard one of the panel members mention the shackles while the group was waiting in the hallway outside her office during individual voir dire.

Thereafter, the court suspended individual voir dire, ordered the shackles removed from the defendant and interviewed the clerk on the record. The court asked the clerk to identify the panel members involved and then examined each member to determine whether any had seen anything unusual about the physical appearance or attire of either defendant in the courtroom. The court also asked if any panel member had overheard other members make comments about the defendants. The court did not specifically ask the panel members if they had observed the defendant in shackles. Each person who was examined denied observing anything out of the ordinary or overhearing comments about the defendants.

At the end of each interview, the court gave an instruction on the presumption of innocence and the burden of proof in criminal cases. The court also gave

counsel for both parties an opportunity to ask their own questions, but counsel declined. When all of the designated panel members had been questioned, the court advised counsel: "You're more than free at any time during the voir dire process to bring this up and . . . if you wish me to make any further individual inquiry, I'll do that. But you're at liberty during the voir dire to bring up anything that you feel is pertinent to that issue . . . ." Defense counsel indicated that the court should address the issue with each of the remaining panel members, and the court agreed to do so.

When individual voir dire resumed, the court asked each of the panel members not originally identified by the clerk if he or she had overheard comments about either defendant. None had. Subsequently, one of the group of five prospective jurors originally examined by the court was selected, without objection, as an alternate juror and, ultimately, as a juror.

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id. "The first two requirements involve a determination of whether the claim is reviewable; the second two requirements involve a determination of whether the defendant may prevail." *State* v. *Woods*, 250 Conn. 807, 815, 740 A.2d 371 (1999).

We conclude that the record is adequate for review and that the claim is of constitutional magnitude alleging the violation of a fundamental right.[2] The defendant can not prevail under the third prong of *Golding*, however, because he has not established that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial.

"In order for a criminal defendant to enjoy the maximum benefit of the presumption of innocence, our courts should make every reasonable effort to present the defendant before the jury in a manner that does not suggest, expressly or impliedly, that he or she is a dangerous character whose guilt is a foregone conclusion. . . . The negative connotations of restraints, nevertheless, are without significance unless the fact of the restraints comes to the attention of the jury." (Citations omitted.) *State* v. *Tweedy*, 219 Conn. 489, 508, 594 A.2d 906 (1991). "The defendant bears the burden of showing that he has suffered prejudice by establishing a factual record demonstrating that the members of the jury knew of the restraints." *State* v. *Webb*, 238 Conn. 389, 455, 680 A.2d 147 (1996).

Here, the defendant has failed to establish a factual record showing that the members of the jury knew of his restraints. Although the clerk testified that the panel

[2] "[A] criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a criminal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom. . . . The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. . . . The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." (Citations omitted; internal quotation marks omitted.) *State* v. *Woolcock*, 201 Conn. 605, 612–13, 518 A.2d 1377 (1986). The claim that the court failed to question the prospective jurors adequately as to whether they may have seen the defendant in shackles thus implicates the defendant's right to a fair trial.

members seated in the second row of the jury box may have observed the defendant wearing shackles and that she thought a panel member had mentioned the shackles while standing in the hallway outside her office, a third party's mere assertion that one or more prospective jurors *may* have seen the defendant in shackles does not constitute evidence that they *did*, in fact, observe him in shackles.

Moreover, the defendant cannot fault the court for failing to question the jurors more closely when he had the opportunity to do so himself. Our Supreme Court's reasoning in *State* v. *Webb*, supra, 238 Conn. 389, in which a similar claim was considered and rejected, is instructive. The defendant in *Webb* also was restrained in the courtroom by shackles. Id., 453. During a court recess while jury voir dire was being conducted, he was taken to a secure holding area adjacent to the courtroom. Id. Two of the sheriffs accompanying the defendant later reported to the court that they saw one or two prospective jurors pass by a door with a glass window through which they might have observed the defendant being placed in the holding room. Id. The court subsequently questioned members of the venire panel individually to determine if they had seen the defendant through the window or had overheard any discussions concerning the case among other panel members. Id. The court reminded the parties that they would have the opportunity during individual voir dire to ask additional questions concerning the incident. Id., 454. On appeal, the defendant claimed that because the court had failed to ask the venirepersons more specific questions regarding their observations, he was denied his right to a fair trial. Id.

The *Webb* court noted that the defendant had not argued that any prospective juror actually saw him in shackles, but only that it was *possible* a juror might have seen him in shackles. Id., 455. The court then

rejected the defendant's claim that he was unfairly prejudiced by the trial court's failure to conduct a more extensive interrogation of panel members because "the defendant was provided with a full opportunity during voir dire examination to ask each venireperson the very question that he now faults the trial court for failing to ask." Id., 455–56. The same reasoning is applicable here, where the defendant also argues that he *may* have been observed in the courtroom wearing shackles. The court provided counsel with ample opportunity to question each prospective juror regarding his or her possible observation of the defendant in shackles, but counsel expressly declined the court's invitation.

Accordingly, the defendant has not demonstrated that a constitutional violation clearly exists that clearly deprived him of a fair trial, and his claim must fail under the third prong of *Golding. State* v. *Golding*, supra, 213 Conn. 239–40.

## II

The defendant next claims that the court violated his state constitutional right to compulsory process[3] and his federal constitutional sixth amendment rights[4] by precluding him from calling alibi witnesses without first considering a less onerous sanction for noncompliance

---

[3] The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him [and] to have compulsory process to obtain witnesses in his behalf . . . . No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

[4] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

with discovery rules. The defendant again seeks review of his unpreserved claim under *State* v. *Golding,* supra, 213 Conn. 239–40.

On February 25, 1999, the state's attorney filed a motion pursuant to Practice Book § 40-21[5] demanding that the defendant give notice of his intent, if any, to present an alibi defense at trial. The defendant did not respond. On October 27, 1999, a jury selection day, the court asked the defendant's counsel to respond to the state's motion. Counsel indicated that he had received new information relating to a possible alibi defense, and he asked the court if he could have until the end of the day to disclose, in writing, information pertaining to such a defense. In response, the court indicated that given the imminence of trial and the passage of time since the state's motion demanding notice of an alibi defense, counsel should be in a position to make an oral representation as to whether he intended to call any alibi witnesses, to be followed by a written disclosure at the end of the day. Counsel indicated that he had no alibi witnesses. The court then informed counsel that he would be precluded from offering an alibi defense at trial. Counsel neither objected nor took exception to the court's pretrial ruling. At trial, the defendant did not seek to offer any alibi testimony.

We conclude that the defendant's unpreserved claim must fail under the second prong of *Golding* because it does not implicate a constitutional right. "A trial court's authority to preclude alibi witnesses for failure to comply with the discovery rules does not violate the defendant's constitutional rights. *State* v. *Boucino,* 199 Conn. 207, 213–14, 506 A.2d 125 (1986) (preclusion of alibi

---

[5] Practice Book § 40-21 provides in relevant part: "Upon written demand filed by the prosecuting authority stating the time, date, and place at which the alleged offense was committed, the defendant shall file within twenty days, or at such other time as the judicial authority may direct, a written notice of the defendant's intention to offer a defense of alibi. . . ."

witnesses is not per se violation of defendant's right to compulsory process). The decision to preclude alibi witnesses is left to the sound discretion of the trial court." *State* v. *McIntyre*, 242 Conn. 318, 330–31, 669 A.2d 911 (1997). We therefore decline to review the defendant's unpreserved claim.

## III

The defendant's final claim is that the court deprived him of his constitutional right to a fair trial by improperly instructing the jury. The defendant claims that the court (1) failed to instruct the jury on all of the essential elements of the offense of robbery in the first degree, (2) improperly commented that the defendant had utilized a dangerous weapon in the course of the robbery and (3) failed to charge that the defendant, as an accessory, may have had an intent different from that of the principal and may have been culpable of a lesser included offense. We address each of those claims in turn.

## A

The defendant claims that the court's instruction on robbery was fatally defective because it did not include the statutory definition of larceny. The defendant seeks review of his unpreserved claim under *State* v. *Golding*, supra, 213 Conn. 239–40.

The court instructed the jury as follows with respect to the robbery charge: "Now, robbery in the first degree, the first alternate charge, is robbery in the first degree, § 53a-134 (a) (2). The defendants here are charged in the first degree in violation of § 53a-134 (a) (2) of the Penal Code, which provides as follows: a person is guilty of robbery in the first degree when, in the course of the commission of the crime as defined in § 53a-133, and I'll give you that definition, or in the immediate flight therefrom, he or another participant in the crime, is armed with a deadly weapon.

* * *

"Here is the definition of a robbery, ladies and gentlemen: A person commits robbery, when in the course of committing a larceny, that is a theft, the taking away of the property of another person, he uses or threatens the immediate use of physical force upon another person for the purpose of (1) preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking or compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny. That's the definition of a robbery. So, basically, it's the taking of property, which is the larceny, and you must determine that there was taking, and in this case, in robbery in the first degree by force or by use of a deadly weapon." The court later instructed that the state was required to prove beyond a reasonable doubt every element of robbery in the first degree "as I define that term for you." The court did not charge the jury on larceny.

There is no evidence in the record that the defendant filed a request to charge concerning the essential elements of robbery. The defendant also took no exception to the court's failure to include in its definition of robbery the essential elements of larceny.

"In a criminal case, the state must prove, and the trial court must instruct the jury on, each essential element of the crime charged. . . . A trial court's failure to instruct on any of these elements warrants reversal regardless of whether the defendant objected at trial. . . . It cannot be considered harmless error for a jury to find an accused guilty without even knowing what are the essential elements of the crimes charged. . . . Put another way, the failure to instruct a jury on an essential element of a crime charged is error because it deprives the defendant of the right to have the jury

told what crimes he is actually being tried for and what the essential elements of those crimes are. . . . After all, when [the defendant] exercised his constitutional right to a jury, he put the [state] to the burden of proving the elements of the crimes charged to a jury's satisfaction . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Payne*, 12 Conn. App. 408, 412–13, 530 A.2d 1110 (1987).

It is, therefore, "constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . *State* v. *Denby*, 235 Conn. 477, 483, 668 A.2d 682 (1995). A claim that the trial court failed to instruct the jury adequately on an essential element of the crime charged necessarily involves the defendant's due process rights and implicates the fairness of his trial. *State* v. *Anderson*, 212 Conn. 31, 36, 561 A.2d 897 (1989)." (Internal quotation marks omitted.) *State* v. *Gayle*, 64 Conn. App. 596, 605, 781 A.2d 383, cert. denied, 258 Conn. 920, 782 A.2d 1248 (2001). Accordingly, the defendant's claim is of constitutional magnitude alleging the violation of a fundamental right. The defendant may not prevail, however, under the third prong of *Golding* because he has not established that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial. See *State* v. *Golding*, supra, 213 Conn. 239–40.

General Statutes § 53a-119 defines larceny in relevant part as follows: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." Connecticut courts have interpreted the essential elements of larceny as "(1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner." (Internal quota-

tion marks omitted.) *State* v. *Calonico*, 256 Conn. 135, 153, 770 A.2d 454 (2001).

We conclude that the court's charge to the jury included all of the essential elements of the crime of robbery, but provided an incomplete description of larceny. The court's instructions as a whole, however, were sufficient to convey the essential meaning of larceny to the jurors. The court instructed that robbery in the first degree involved a larceny, and then described larceny as "a theft, the taking away of the property of another person." To the extent that the charge failed to include the further instruction that the crime of larceny includes the notion of a wrongful taking with the intent to permanently deprive, the charge was imperfect, or technically incomplete.

"The standard of review for an improper instruction on an element of an offense is whether it is reasonably possible that the jury was misled. *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995); *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994). In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. *State* v. *Estep*, 186 Conn. 648, 651–52, 443 A.2d 483 (1982). . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Reed*, 174 Conn. 287, 305, 386 A.2d 243 (1978) . . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. *State* v. *Roy*, 173 Conn. 35, 40, 376 A.2d 391 (1977) . . . . The charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict." (Internal quotation

marks omitted.) *State* v. *Gayle*, supra, 64 Conn. App. 605. "While the instructions need not be exhaustive, perfect or technically accurate, *they must be correct in law*, adapted to the issues and sufficient for the guidance of the jury." (Emphasis in original; internal quotation marks omitted.) *Richmond* v. *Ebinger*, 65 Conn. App. 776, 779, 787 A.2d 552 (2001).

By stating that larceny involved a "theft, the taking away of the victim's property," the court conveyed the essential characteristics of larceny. "[W]hen a word contained in an essential element carries its ordinary meaning, failure to give the statutory definition will not constitute error." *State* v. *Kurvin*, 186 Conn. 555, 562, 442 A.2d 1327 (1982). The word "theft" has an ordinary meaning that conveys both wrongfulness and permanent retention.[6] On hearing that larceny means a theft or a taking away, there was no reasonable likelihood that the jury was misled because the jury was informed that to find the defendant guilty, it had to find that he aided Junkie Jay in a wrongful taking with the intent permanently to deprive Welch of his medallion and chain.

Moreover, the court's instructions are not to be examined in a vacuum, but in the context of the factual issues raised at trial. Id., 558. Here, apart from defense counsel's cross-examination of Welch to demonstrate by his prior felony convictions that he was not a trustworthy witness, there was no suggestion at trial that the forcible removal of the victim's chain and medallion by Junkie Jay was anything but wrongful. Nor was there any suggestion that the taking was not intended to be permanent. Indeed, at trial, Welch testified that the

---

[6] The current edition of Black's Law Dictionary defines "theft" as "[t]he felonious taking and removing of another's personal property with the intent of depriving the true owner of it; larceny." Black's Law Dictionary (7th Ed. 1999). The previous edition of Black's Law Dictionary defined "theft" as "[a] popular name for larceny." Black's Law Dictionary (6th Ed. 1990).

chain was never returned to him. By stating that larceny involved a theft, a taking away of the victim's property, the court thus conveyed the essential characteristics of larceny and, in the context of the evidence, it cannot reasonably be argued that the charge, while incomplete, misled the jury.

Accordingly, the charge was sufficient for the guidance of the jury, and the defendant has not shown that a constitutional violation clearly exists that clearly deprived him of a fair trial. Consequently, the defendant has not satisfied the third prong of *Golding* and his claim must fail.

## B

The defendant next claims that he was denied his right to a fair trial because the court improperly commented on the evidence in its instructions to the jury. He claims that in stating that "I don't think there is any question . . . that there was a deadly weapon," the court impermissibly suggested that the weapon Faughnan retrieved from the defendant the day after the robbery was one of the weapons used to strike Welch in the course of the robbery. We disagree.

At trial, testimony was offered with respect to three issues regarding the gun that was retrieved from the ground when the defendant and his companion fled from Faughnan. The first issue was whether the person who placed the gun on the ground was the defendant or his companion. The second and third issues were whether that particular gun had been used by any of the assailants during the robbery and whether the gun was operable.

Regarding the first two issues, Welch identified the defendant and Salmond as the two men who had beaten him with guns during the robbery. He also identified the handgun taken from the defendant as one of the

weapons used during the robbery. When shown the gun and asked if it looked similar to those used in the robbery or looked familiar to him, Welch replied, "It does." He then was asked why it looked familiar, to which he replied, "I was hit with that one." When he was asked whether it appeared similar to one of the objects with which he was hit, he replied, "Same, black; about the same size."

Edward McPhillips, from the Connecticut state police forensic laboratory, testified for the state as to the gun's operability. McPhillips stated that he tested the weapon retrieved from the defendant and that the weapon was capable of discharging bullets. Following McPhillips' direct testimony, there was no cross-examination by counsel for either defendant. The testimony concerning operability was, therefore, unchallenged.

In its instructions to the jury, the court stated: "Now, let me say this to you, ladies and gentlemen, my recollection of the evidence—again it's your recollection which controls, but this is just my observation, if you believed that there was a deadly weapon used in this alleged crime, if you find there was a robbery, that's a fact that you are going to have to decide, but if you do decide that there was a robbery, *I don't think there is any question, ladies and gentlemen, that there was a deadly weapon, but that again is your decision.*" (Emphasis added.)

After those comments, the court continued: "For you to find the defendants, either one or both, guilty of the charge, the state must prove beyond a reasonable doubt that the defendant committed a robbery as defined in § 53a-133. . . . Remember, you will consider robbery in the first degree only after you have determined that the defendant committed a robbery. Robbery in the first degree requires proof of an aggravating factor that occurs in the course of the commission of a robbery or

the immediate flight from the robbery. The aggravating factor under this section for your consideration is that in the course of the commission of the robbery or the immediate flight therefrom, the defendant or another participant in the robbery or the crime was armed with a deadly weapon. The state must prove this aggravating factor beyond a reasonable doubt.

"Under our law, a deadly weapon is any weapon whether loaded or unloaded from which a shot may be discharged. You must decide if the state has established beyond a reasonable doubt that the weapon admitted into the evidence was one from which a shot may have been discharged.

"You have to determine whether that's the weapon, but there was credible evidence, if you so believe, it from the expert from the forensic [laboratory], that, that was an operable weapon, a weapon from which there could be a discharge. In fact, he testified that he fired the gun twice into the bucket or pail of water.

"The state does not have to prove that the defendants intentionally armed themselves with a deadly weapon or that any of the other participants intentionally armed themselves with a deadly weapon in the course of the commission of the crime . . . . The state has to prove that either the defendant or any one of the participants in the alleged robbery was armed with a deadly weapon.

"You must first find that the state has established beyond a reasonable doubt that the defendant committed a robbery . . . . You must then decide if the state has proven that during the course of the robbery . . . either the defendant or another participant was armed with a deadly weapon. If you find that the defendant or one of the other participants was armed with a deadly weapon beyond a reasonable doubt, then you should find the defendant or the defendants guilty . . . . If the state fails to establish any of the elements of robbery

in the first degree beyond a reasonable doubt, then you should find the defendants not guilty."

Later in the charge, the court provided the jury with an explanation of § 53a-134 (a) (4), that portion of the statute pertaining to the display of what a perpetrator represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm. In that regard, the court stated: "Obviously shotgun, machine gun, don't apply here, it's—was there a pistol or a revolver as that forensic officer defined it. He said it was one or the other, and you have to determine whether in fact that weapon was involved in this particular crime."

Those portions of the charge were amplified by the court's general instructions to the jury delineating their fact-finding responsibilities, their right to disregard the comments by either the court or counsel on the evidence if those comments did not comport with their own recollections and their obligation to independently assess the evidence.

At the conclusion of the instructions, defense counsel took exception to the following language used by the court in instructing the jury: "I don't think there is any question, ladies and gentlemen, that there was a deadly weapon." Counsel insisted that "that's a question for the jury to decide." The court responded: "Well, I think I said that, there was no question that there was a deadly weapon if they believed that there was a weapon used in the crime. I don't think I said that they are to immediately infer or to accept without reservation, that there was a weapon here in this crime or that this weapon that was offered was in fact the weapon used in the crime. I think that I made that pretty clear. I'll overrule that."

"A trial court has broad discretion to comment on the evidence adduced in a criminal trial. . . . A trial

court often has not only the right, but also the duty to comment on the evidence. . . . The purpose of marshaling the evidence, a more elaborate manner of judicial commentary, is to provide a fair summary of the evidence, and nothing more; to attain that purpose, the [trial] judge must show strict impartiality. . . . Fair comment does not become improper merely because it tends to point out strengths, weaknesses, or difficulties of a particular case. . . . The trial court may, at its discretion, call the attention of the jury to the evidence, or lack of evidence, bearing upon any point in issue and may comment upon the weight of the evidence so long as it does not direct or advise the jury how to decide the matter." (Citation omitted; internal quotation marks omitted.) *State* v. *Young*, 68 Conn. App. 10, 17, 791 A.2d 581, cert. denied, 260 Conn. 909, 795 A.2d 547 (2002).

The claim of an improper instruction on an element of an offense is of constitutional magnitude. *State* v. *Gayle*, supra, 64 Conn. App. 605. We therefore review the entire charge to determine whether it is reasonably possible that the jury was misled. "In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge." (Internal quotation marks omitted.) *State* v. *Young*, supra, 68 Conn. App. 17.

We conclude that the court did not advise the jury, as the defendant claims, that the weapon retrieved from the defendant the day after the robbery was used to strike Welch. The court explained in response to the defendant's objection that the language it used was intended to convey only that "there was no question

that there was a deadly weapon" *if* the jurors believed that a weapon was used in the crime and that the weapon retrieved from the defendant was one of the weapons used in the robbery.

The defendant argues that even if the court did not instruct that the weapon in question was used in the crime, the court improperly commented on its operability. He further argues that the weapon's operability was a factual question for the jury to decide and that the jury should have been free to find that the weapon introduced into evidence was not a deadly weapon.

Although we do not encourage the court to make conclusory statements regarding the evidence, the statement made by the court that the weapon in question was deadly did not deprive the defendant of a fair trial where the operability of the gun essentially was uncontested. Moreover, the court did not direct or advise the jury to find that the weapon was deadly. To the contrary, immediately before uttering the disputed words, the court advised the jurors that "it's your recollection which controls," and immediately thereafter added, "but that again is your decision." Indeed, the court specifically directed that the *jurors* must decide if the state had established beyond a reasonable doubt that the weapon admitted into evidence was one from which a shot may have been discharged: "You have to determine whether that's the weapon, but there was credible evidence, *if you so believe it,* from the expert from the forensic [laboratory], that, that was an operable weapon, a weapon from which there could be a discharge." (Emphasis added.)

Furthermore, reviewing the charge in its entirety, we conclude that the court did not unfairly comment on the evidence. The court repeatedly instructed that the jurors were the sole finders of fact, that every element of the crimes charged had to be proved beyond a reason-

able doubt and that if the state failed to prove any element beyond a reasonable doubt, they should find the defendants not guilty. Accordingly, the court's instructions did not mislead the jury and, consequently, they did not unduly prejudice the defendant and deprive him of a fair trial.

## C

The defendant also claims that the court failed to charge the jury that as an accessory, he may have had an intent different from that of the principal and may have been culpable of a lesser included offense. The defendant seeks review of his unpreserved claim under *State* v. *Golding,* supra, 213 Conn. 239–40.

We conclude that the record is adequate for review and that the defendant's claim that the court improperly instructed the jury on the element of intent is of constitutional magnitude. We reject the defendant's claim, however, under the third prong of *Golding* because he has not established that a constitutional violation clearly exists that clearly deprived him of a fair trial.

The court charged the jury as follows on the element of accessory liability: "Under the law, an accessory is just as guilty as if he were the principal offender. Being an accessory is not a crime in and of itself, but it is only another way of committing a crime. The principal responsibility of an accessory is provided in [General Statutes § 53a-8 (a)] of our Penal Code, and that section states as follows: 'A person, acting with the mental state required for the commission of an offense, who . . . intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct, and may be prosecuted and punished as if he were the principal offender.'

"So focus . . . on a person's mental state and does he do something which intentionally aids another per-

son to engage in the conduct which constitutes the crime. If you so find, then that person is as guilty as the person who is the principal offender, but you must find that the state has proved that beyond a reasonable doubt. A person is an accessory if he intentionally aids another person to engage in the conduct that constitutes the offense. A person acts intentionally with respect to the result or to the conduct when his conscious objective is to cause such result or to engage in such conduct. Intentionally aid therefore means to act in any manner, the conscious objective of which is to help, assist or support the principal offender.

"In order to be an accessory under the statute, a person must not only intentionally aid another person to engage in conduct that constitutes the offense, but he must commit one of the following, ladies and gentlemen. He must have that mental state required for the commission of the underlying offense or crime and share the same unlawful purpose or purposes in common with the person who actually commits the offense. It is not enough that [the] person committed acts specified in the statute as I am now reading to you, that in fact aided the actual participation or perpetration of the crime, he must also have the same mental state and purpose necessary to be guilty of the crime as does the actual perpetrator.

"In order to prove the defendant or defendants guilty as an accessory to a crime charged in any of the counts, the state has the burden to prove that the defendant with the requisite mental state intentionally aided another person who actually committed the crime charged in that count . . . . Therefore, you must find that the state has proven beyond a reasonable doubt that the defendant or defendants assisted another person to commit the crime of robbery, as I have defined it to you with the requisite state of mind, as I explained to you in this charge."

General Statutes § 53a-8 (a) provides in relevant part: "A person, acting with the mental state required for commission of an offense, who . . . intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

The defendant concedes that the court instructed on the element of accessory liability and "in substance charged criminality of intent and community of unlawful purpose." He claims, however, that the court improperly failed to charge that, as an accessory, he may have had an intent different from that of the principal and may have been culpable of a lesser included offense.

As previously stated, the standard of review for an improper instruction on an element of an offense is whether it is reasonably possible that the jury was misled. *State* v. *Prioleau*, supra, 235 Conn. 284. We conclude that it was not.

In *State* v. *Floyd*, 253 Conn. 700, 721, 756 A.2d 799 (2000), our Supreme Court considered a claim that under Connecticut law, an accessory need not share the same criminal intent as the principal to be convicted as an accessory, but may have had an intent different from that of the principal and be convicted, as an accessory, of a crime different from that for which the principal is convicted. The court, however, did not resolve that issue, but concluded that even if the statutory interpretation urged by the defendant was correct, any error in the jury instructions was harmless beyond a reasonable doubt because the jury reasonably could not have found that the defendant in the case had a level of intent different from that of the principal. Id., 723–24.

We conclude likewise. The defendant points to Welch's testimony that Junkie Jay, and not the defendant, was the person who robbed him, but Welch also

indicated that the defendant and Junkie Jay acted in concert to accomplish the robbery. Welch testified that after Junkie Jay grabbed the chain and medallion from his neck, the defendant and Salmond accosted him at the bottom of the steps and prevented him from pursuing Junkie Jay. Welch further testified that the defendant and Salmond pulled him toward the alley, beat him about the head and attempted to rifle his pockets while Junkie Jay stood by and that all three fled when the police arrived on the scene.

Accordingly, we conclude that there was no evidence from which the jury reasonably could have inferred that the defendant's intent differed from that of the principal, and it is not reasonably possible that the jury was misled by the court's instructions on accessory liability. The defendant, therefore, has failed to prove that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial, and his claim must fail under the third prong of *Golding*. See *State* v. *Golding*, supra, 213 Conn. 239–40.

The judgments are affirmed.

In this opinion the other judges concurred.