******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
JERMAIN V. RICHARDS
(AC 43140)

Keller, Prescott and Bishop, Js.

*Syllabus*

Convicted, after a jury trial, of the crime of murder, the defendant appealed. The victim, who had been the defendant's long-term girlfriend, had last been seen in the company of the defendant by the defendant's mother and, shortly thereafter, the victim's cell phone stopped making and receiving any form of communication. One month after the victim's disappearance, two of her limbs, which had been severed from her body using a sharp instrument, were discovered approximately 1.5 miles from the defendant's residence, although her body has never been recovered. Prior to the victim's disappearance, the defendant, a licensed practical nurse, had stated to an acquaintance, J, that, as a nurse, he knew how to get rid of someone. On appeal, the defendant claimed that there was insufficient evidence to support a murder conviction, specifically, that the state failed to prove the manner, means, place, cause, and time of death. He further claimed that the trial court erred in not giving a special credibility instruction with respect to the testimony of J, a cooperating witness, and that his right to due process was violated by his retrial because the state had twice failed to meet its burden of proof. *Held*:

1. The evidence presented at trial was sufficient to support the defendant's conviction of murder: the jury reasonably could have inferred that the defendant intended to cause the victim's death and did in fact cause her death as there was evidence presented that the defendant was controlling and domineering toward the victim, he had choked the victim one month before her disappearance, the victim had expressed a desire to end her relationship with him, the defendant made a statement that, as a nurse he knew how to get rid of someone, the victim had last been seen alive at the defendant's residence, two of the victim's severed limbs were discovered approximately 1.5 miles from the defendant's residence, some of the victim's personal belongings were discovered in a trash bag at the defendant's residence, the bathtub, sink, and other plumbing materials had been removed from the defendant's other residence, and the interior of the defendant's car had been detailed shortly after the victim's disappearance.

2. The trial court did not commit plain error in failing to give a special credibility instruction with respect to J's testimony; although there are three categories of witnesses that require such an instruction, as set forth by our Supreme Court in *State* v. *Diaz* (302 Conn. 93), J did not fit into any of those categories, and the court gave both a general credibility instruction as well as a credibility instruction with regard to J, who was an individual with a criminal record on probation at the time of his testimony.

3. The defendant could not prevail on his claim that the state's decision to prosecute him for a third time after his two previous trials had ended in mistrials violated his right to due process; a mistrial that has been declared following a hung jury does not terminate original jeopardy and, therefore, a subsequent trial does not violate the prohibition against double jeopardy.

Argued November 19, 2019—officially released March 10, 2020

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *E. Richards, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Norman A. Pattis*, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *Joseph T. Corradino*, senior assistant state's attorney, and *Ann F. Lawlor*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J.The defendant, Jermain V. Richards, appeals from the judgment of conviction, rendered after a third jury trial, of murder in violation of General Statutes § 53a-54a (1).[1] On appeal, the defendant claims that (1) there was insufficient evidence to support a conviction and (2) the court erred in not giving a special credibility instruction applicable to the testimony of a cooperating witness.[2] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In April, 2013, the victim was a sophomore at Eastern Connecticut State University (ECSU). At that time, she had been dating the defendant, who was ten years her senior, since she was in high school. The victim often stayed with her grandmother, especially on the weekends, at her grandmother's house in West Haven. At the time of the victim's disappearance, the defendant resided in the basement area of his mother's house at 115 Beardsley Park Terrace in Bridgeport; however, he also owned a two-family housing unit at 1719 Hubbell Avenue in Ansonia. The defendant rented out the second floor unit of the Ansonia property.

In the days following April 20, 2013, after the victim had failed to respond to various phone calls and text messages and after she had failed to attend her classes, the ECSU Department of Public Safety commenced a missing person investigation with the assistance of the Connecticut State Police. Over the course of that investigation and in order to ascertain the victim's whereabouts, approximately forty-five investigators conducted 400 interviews, executed nineteen search warrants, and searched more than twenty-five different locations. The defendant became a person of interest on or about April 26, 2013, when the police learned that he was the last person to have been with the victim. Police suspicion of the defendant's involvement in the victim's disappearance heightened upon learning more about the nature of the relationship between the victim and the defendant, including events that transpired in the months leading up to her disappearance. Those events tended to show that the defendant was seeking to control the victim to the extent that, at times, he stalked her when she sought to go out without informing him of her whereabouts and, over the months leading up to the victim's disappearance, he had become increasingly violent toward her.

Specifically, prior to her disappearance, and throughout the course of her relationship with the defendant, the victim was constantly on her phone texting or speaking with the defendant, even while she was spending time with her family and friends. The victim's sister, Chaharrez Landell,[3] described the defendant as possessive, obsessive, controlling, and manipulative because

he always had to know where she was, with whom, and what she was doing. If, and when, the defendant was unable to connect with the victim, he would contact her friends, Chaharrez, and her brother-in-law, Dumar Landell, to ascertain her activities and location. Once, the defendant went so far as to call Dumar, after speaking to Chaharrez, to confirm the veracity of Chaharrez' answers with regard to the victim's whereabouts, and he explained to Dumar that "[w]e can't trust these bitches."

Additionally, in the year prior to her disappearance, there were three separate instances in which the defendant either showed up uninvited to the location where the victim was or the defendant was spotted waiting for the victim, without prior communication or permission. More specifically, one night when the victim, Chaharrez, and Dumar were coming back from a club in Bridgeport and were heading for her grandmother's home in West Haven, they discovered the defendant parked on a hill near the home. Prior to their arrival, the victim had ignored phone calls from the defendant or directed them to her voicemail. When the victim saw the defendant's car, she instructed Dumar to keep driving while she ducked down in her seat to avoid being seen. All three of them waited around the corner for a few hours until they saw that the defendant was no longer in the area.

On another occasion, the victim, Chaharrez, and Dumar, again, were returning from a club in Bridgeport when they stopped at a restaurant to use the restroom. When the victim came out of the restaurant, she spotted the defendant in the parking lot and immediately went to talk with him for a few minutes before returning to Chaharrez and Dumar in order to go back to ECSU. Prior to that interaction, the defendant was not invited by the victim to join her, nor had the victim shared with the defendant where she intended to be. On another night, when the victim was staying with Chaharrez and Dumar in their Waterbury apartment, the fire alarm went off, requiring immediate evacuation of the building. Once outside, Dumar, Chaharrez, and the victim were surprised to discover that the defendant was also outside, without having previously made his presence known to the victim.

In March, 2013, approximately one month before the victim's disappearance, she called Chaharrez asking for a ride from a house in Norwalk, where she was staying with the defendant. Chaharrez stated that the victim was frantic, scared, and spoke in a whisper. The victim told Chaharrez that she and the defendant had gotten into an argument during which the defendant choked her. The victim said that the defendant had put her in a headlock, thrown her on the bed, and tried to suffocate her. Additionally, the victim told Chaharrez that she could not breathe and she implored her to come and

pick her up immediately. Chaharrez further testified that, once she and her husband arrived, the victim snuck out of the house while the defendant was asleep, got her belongings out of the trunk of the defendant's car, and got into Chaharrez' car where she presented as upset, crying, and relieved to have been picked up. Once in the car, the victim said that she did not want to be in a relationship with the defendant anymore, but did not know how to break up with him. Chaharrez stated that this incident was not reported to the police and that, even though the victim lived with her for the remainder of the school break, she saw the victim in the company of the defendant just three days after this incident and learned that the defendant had purchased new clothes for the victim and groceries to bring back to school.

At a point in time close to the choking incident, the defendant purchased a car from a former high school acquaintance, Jevene Wright. Upon returning to pick up license plates for his new car, the defendant confided in Wright that the victim had cheated on him and broken up with him using Facebook.[4] The defendant also told Wright that the victim "doesn't know who she's messing with, you know, I'm a nurse and I'll get rid of her." At a later date, shortly before the victim's disappearance, the defendant and Wright spoke over the phone, during which the defendant admitted that he had choked the victim because he was "upset" at the time. Later, the victim told Chaharrez and Dumar that she was looking to end her relationship with the defendant, but did not know how to do it.

On April 20, 2013, the victim was scheduled to attend a luncheon with one of the ECSU organizations for which she was the secretary. The victim, however, informed friends and colleagues that she would be unable to attend because she needed to go home to her grandmother. Video surveillance footage revealed that the victim exited her campus residence hall at or about 12:25 p.m. on April 20, 2013, and, shortly thereafter, entered the defendant's car to leave campus. The defendant's mother, Leonie McQueen, said she encountered the victim, in the company of the defendant, briefly at her Bridgeport residence at or about 2:15 p.m. on April, 20, 2013, while she was getting ready for work. The victim was never again seen alive.

After the victim was reported missing and the search for her had commenced the week following April 20, 2013, police made several discoveries that culminated in the defendant's arrest and subsequent prosecution. First, the police learned that the defendant failed to report for his shift at work on Sunday, April 21, 2013, from 3 to 11 p.m., but made it to his second shift, that same day, beginning at 11 p.m. Second, the state police's K9 unit discovered human remains, in the form of an arm and a leg, approximately 1.5 miles from the defen-

dant's Bridgeport residence. The DNA of both limbs matched the DNA from the victim's toothbrush, which was obtained from her ECSU residence. Third, the defendant was a licensed practical nurse, and the two medical examiners determined that the limbs were removed postmortem, by the use of a sharp instrument.[5] Fourth, the defendant's 2009 Nissan was searched and seized on April 26, 2013, and, when examined, the interior of the car appeared to the police to have been recently detailed. Fifth, cellular site location information analysis revealed that the victim's phone last connected to a tower closest to the defendant's Bridgeport residence at or around 4:02 p.m. on April 20, 2013, reasonably creating the inference that either the phone had been turned off or discarded at around that time on the same date as her disappearance. Sixth, the police searched both the defendant's Bridgeport and Ansonia residences. At the Ansonia residence, in the unit belonging to the defendant, the police discovered that the bathroom was under construction and the sink, bathtub, and other plumbing materials were missing. Lastly, in the Bridgeport residence, the police found the victim's birth control prescription and her gold necklace in a black garbage bag in the basement next to the washer and dryer.[6]

The defendant was arrested on May 18, 2013, for murder. He entered a plea of not guilty and subsequently was tried by a jury. The first two trials resulted in hung juries; thus, the court declared mistrials in each trial. The state's attorney's office elected to prosecute the defendant a third time and, at the conclusion of the jury trial, the defendant was found guilty. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that there was insufficient evidence to support a murder conviction.[7] More specifically, he argues that the state failed to prove the manner, means, place, cause, and time of death and, as a result, the jury convicted him on the basis of speculation rather than by proof beyond a reasonable doubt. Additionally, the defendant contends that the inferences apparently drawn by the jury were unreasonable because the state failed to prove any criminal acts committed by the defendant or that he intended to commit such acts. In response, the state argues that the cumulative effect of all the evidence and inferences reasonably to be drawn from it established beyond a reasonable doubt that the defendant intended to cause the death of the victim and that he did, in fact, cause the victim's death.

We begin our analysis by setting forth the well settled standard of review applicable to a sufficiency of the evidence claim, wherein we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reason-

ably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Leniart*, 166 Conn. App. 142, 169–70, 140 A.3d 1026 (2016), rev'd in part on other grounds, 333 Conn. 88, 93, 215 A.3d 1104 (2019).

Additionally, given the nature of this appeal, it is important to underscore that there is a fine line between the making of reasonable inferences and engaging in speculation—the jury is allowed only to do the former. See, e.g., *Curran* v. *Kroll*, 303 Conn. 845, 857, 37 A.3d 700 (2012). "However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment. . . .

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to

exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference." (Internal quotation marks omitted.) Id.

"Finally, on appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Leniart*, supra, 166 Conn. App. 170.

Section 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ." Thus, in order for the defendant to have been found guilty of murder, the jury needed to have concluded beyond a reasonable doubt that (1) he had the intent to cause the death of the victim and (2) that he did, in fact, cause her death. General Statutes § 53a-54a (a). We address each element in turn.

### A

"The specific intent to kill is an essential element of the crime of murder. . . . To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . This does not require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . . An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and *the events leading to and immediately following the death*." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *White*, 127 Conn. App. 846, 851–52, 17 A.3d 72, cert. denied, 302 Conn. 911, 27 A.3d 371 (2011). "Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct. . . . In addition, intent to kill may be inferred from evidence that the defendant had a motive to kill."

(Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 67, 43 A.3d 629 (2012).

Moreover, a jury is permitted "to posit a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain. That is essentially what circumstantial evidence means, however, and it is what our case law generally permits." *State* v. *Sivri*, 231 Conn. 115, 130–31, 646 A.2d 169 (1994).

We conduct our analysis in a manner similar to that of our Supreme Court in *Otto*, by recognizing the defendant's contention that there are pieces of evidence absent from this case that have existed in other cases with regard to supporting an inference of an intent to kill. Just as in *Otto*, in the case at hand, "there was no evidence of the cause and manner of death or the specific type of wound inflicted on the victim" that led to her death. *State* v. *Otto*, supra, 305 Conn. 67. Nevertheless, we conclude that there was sufficient evidence presented to the jury that the defendant had the specific intent necessary to support a conviction of murder.

The jury heard testimony regarding domestic violence from Duane de Four, a consultant who does violence prevention and education work, focusing on dating violence, sexual assault, harassment, and stalking. Without making specific references to the present case, he testified that the elements involved in dating violence include the recurring tendencies of an abusive partner. According to de Four, dating violence usually involves one person "trying to establish power and control [and] dominance over another person in that relationship . . . ." When asked to elaborate, de Four testified that "somebody who is trying to establish power and control over their partner might do things like try and control who they see, who they spend time with . . . and that's often present[ed] in the form of jealousy. . . . [S]talking is often a part of that as well. Stalking . . . is a very common part of abusive relationships where the stalking is used to create fear in the victim. So the perpetrator of that violence is . . . doing whatever, whether that's some sort of online stalking or following the person where they live, where they work, that sort of thing to make them feel feared and, you know, that this other person has some control over me. You know, then, of course, physical violence . . . ."

He explained in depth the common stages in which dating violence occurs. He described the "cycle of abuse"—where the relationship may alternate between honeymoon phases and incidents of abuse, with the abuse increasing in severity, perhaps starting with verbal attacks and attitudes of disparagement but, in time, intensifying to include physical violence. He indicated that, in an abusive relationship, violence starts off as something like name-calling and then spirals into something that "gets more and more violent, whether that's

physically or emotionally . . . it might become longer lasting or more intense" and then returns to the honeymoon phase. According to de Four, victims of abusive relationships attempt to leave the relationship several times "before being able to leave for good. And . . . once that person leaves, we see, often times, that's where violence gets . . . ramped up . . . ." This testimony, from an expert in domestic violence with insight into how verbal abuse may escalate into physical violence, reasonably set the stage for the jury to piece together and put into context the state's evidence regarding the course of the abusive relationship between the defendant and the victim, particularly as it related to its history of increasing abuse and the victim's alternating attempts to break free of the defendant intermixed with resumptions of their relationship.

There was testimony from multiple witnesses, which the jury could have credited, to support the inference and, thus, the conclusion that the defendant intended to cause the victim's death. At the beginning of trial, the jury heard evidence that the defendant was constantly reaching out to the victim to ascertain her location and, when he was not satisfied with the information that he had received, he would seek information from friends and family members of the victim. Additionally, prior to the victim's disappearance, there were at least three instances in which the defendant appeared, uninvited, in places where the victim was located, or places to which she was en route. From this evidence, the jury reasonably could have inferred that the defendant was controlling, domineering, and always needed to know the victim's whereabouts. Indeed, the evidence suggests that the defendant intended to exercise a form of ultimate control over the victim by causing her death.

Additionally, three witnesses testified regarding an incident that occurred one month prior to the victim's disappearance, in which the defendant choked and threw the victim. The victim's sister, Chaharrez, and brother-in-law, Dumar, both testified about having to drive, in the middle of the night, to pick up the victim because she had just been choked by the defendant while they were in the midst of an argument. Wright testified, as well, that the defendant admitted to him that he choked the victim and when Wright asked why, the defendant explained that he did it because he was "upset." Such conduct, in and of itself, can be considered to be evidence of intent to commit murder. See, e.g., *State* v. *Edwards*, 247 Conn. 318, 322, 721 A.2d 519 (1998) (arguments between defendant and victim can be evidence that defendant intended to cause victim's death).

Prior to her disappearance, the victim had expressed to Chaharrez and Dumar that she wanted to break up with the defendant. Additionally, according to Wright, the defendant told him that the victim had cheated on

him and broken up with him through Facebook. In that same conversation, the defendant professed that, because he was a nurse, he knew how to "get rid of her." The defendant's statement reasonably would have allowed the jury to infer that he made the decision to kill the victim because his comment insinuated that he had thought previously about how he would use his medical training to, in fact, murder her. The inference of the defendant's plan to kill was bolstered by evidence that, after the victim's disappearance, the police found the victim's left arm and left leg, severed from her body, approximately 1.5 miles from the defendant's residence in Bridgeport. Testimony also revealed that the victim's limbs had been severed using a sharp instrument. The defendant's statements to Wright, in conjunction with the fact that pieces of her dismembered body, which were severed with a sharp device, were later found in close proximity to the defendant's home after he had admitted that the victim broke up with him, allowed the jury to reasonably infer the defendant's intent to murder the victim. See, e.g., *State* v. *Crafts*, 226 Conn. 237, 251, 627 A.2d 877 (1993) (evidence of prearranged plan to kill victim and conceal her remains deemed sufficient evidence of intent).

The jury also heard evidence that the victim was last seen alive on the ECSU campus next to the defendant's car around noon and then, a few hours later, was last seen with the defendant by the defendant's mother at or about 2:15 p.m. on April 20, 2013, shortly before the victim disappeared. Additionally, the jury learned that the victim's cell phone stopped making and receiving any form of communication after 4 p.m., less than two hours after she was seen with the defendant. Thereafter, the victim was never seen or heard from again, until two of her severed limbs were found one month later. Based on this information, it would have been reasonable for the jury to infer that the victim, who had repeatedly stated her desire to break up with the defendant, attempted to break up with the defendant on April 20, 2013, and, as a result, the defendant, in light of his controlling nature, had a motive to kill her, and thus exercised the ultimate form of control over her. See *State* v. *Gary*, 273 Conn. 393, 407, 869 A.2d 1236 (2005) ("Intent to cause death may be inferred from . . . events leading to . . . the death. . . . In addition, intent to kill may be inferred from evidence that the defendant had a motive to kill." (Citation omitted; internal quotation marks omitted.)).

Finally, there were several pieces of physical evidence, or lack thereof, which would have enabled the jury to reasonably infer an intent to commit murder. As noted, pursuant to various warrants, the police searched the defendant's car and his residences in Ansonia and Bridgeport. During the search of the car, the police obtained DNA evidence belonging to the victim from the seat cushion, which, by itself, is not itself a

remarkable finding because the victim had been known to travel in the defendant's car. More significantly though, the investigating officers noted that the car appeared to have been detailed. With regard to the search of the Ansonia residence, the police discovered that the bathroom had been ripped apart and was missing a bathtub, sink, and other plumbing materials. As a result of the search of his Bridgeport residence, the police found the victim's birth control prescription and her gold necklace in a black garbage bag in the defendant's basement. In *Otto*, our Supreme Court concluded that the defendant's attempt to clean and demolish the locations associated with the murder was evidence of the defendant's consciousness of guilt and that such "consciousness of guilt evidence [is] part of the evidence from which a jury may draw an inference of an intent to kill." *State* v. *Otto*, supra, 305 Conn. 73.

On the basis of the foregoing evidence, *and* because the victim was last seen alive at the defendant's residence after leaving the ECSU campus in his car, it would have been reasonable for the jury to infer that the defendant intended to kill the victim and then took a series of steps to cover up any evidence that would connect him to her disappearance and murder. We conclude that because these inferences are not so unreasonable as to be unjustifiable, they are more than mere speculation or conjecture and, therefore, cross over the proverbial line as reasonable inferences drawn by the jury.

B

During oral argument before this court, counsel for the defendant repeatedly asserted that there was no evidence to show the cause of death, meaning that the state failed to prove beyond a reasonable doubt that the defendant caused the death of the victim. As our precedent makes clear, however, "proof of death by criminal means or proof of the exact cause of death is not required" to show that the defendant caused the death of the victim. *State* v. *Wargo*, 53 Conn. App. 747, 766, 731 A.2d 768 (1999), aff'd, 255 Conn. 113, 763 A.2d 1 (2000). Additionally, "[t]he state does not have to connect a weapon directly to the defendant and the crime." (Internal quotation marks omitted.) *State* v. *Torres*, 168 Conn. App. 611, 621–22, 148 A.3d 238 (2016), cert. granted in part on other grounds, 325 Conn. 919, 163 A.3d 618 (2017).

"Causation is an essential element of the crime of murder. . . . In order for legal causation to exist in a criminal prosecution, the state must prove beyond a reasonable doubt that the defendant was both the cause in fact, or actual cause, as well as the proximate cause of the victim's injuries. . . . In order that conduct be the actual cause of a particular result it is almost always sufficient that the result would not have happened in the absence of the conduct; or, putting it another way,

that but for the antecedent conduct the result would not have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Guess*, 44 Conn. App. 790, 797–98, 692 A.2d 849 (1997), aff'd, 244 Conn. 761, 715 A.2d 643 (1998).

"Proximate cause in the criminal law does not necessarily mean the last act of cause, or the act in point of time nearest to death. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, *unbroken by an efficient, intervening cause, to the resulting death.* It is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence." (Emphasis in original; internal quotation marks omitted.) Id., 800. In short, "the defendant's conduct must contribute substantially and materially, in a direct manner, to the victim's injuries; and . . . the defendant's conduct cannot have been superseded by an efficient, intervening cause that produced the injuries." *State* v. *Leroy*, 232 Conn. 1, 13, 653 A.2d 161 (1995).

As noted, the jury was presented with various pieces of evidence that, when placed in context, pointed to the defendant's culpability for the victim's death. That evidence included statements by the defendant that, as a nurse, he knew how to get rid of the victim if she decided to "mess" with him. "[A] declaration *indicating* a present intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed." (Emphasis added.) *State* v. *Farnum*, 275 Conn. 26, 35, 878 A.2d 1095 (2005). It would have been reasonable for the jury to credit the defendant's statement that, as a nurse, he knew how to get rid of the victim, as an indication of a then-present intent to cause her death as evidence that he did, in fact, cause her death. See id. This, in conjunction with all the other evidence adduced at trial, would have allowed the jury to reasonably infer that an action by the defendant was the actual and proximate cause of the victim's death.

For comparison, we turn to our Supreme Court's decision in *Sivri*. In that case, the court found that the fact that the state presented no evidence of precisely how the victim died did not undermine the conclusion that the defendant in fact killed her. More specifically, our Supreme Court recognized that there was "no body or evidence of body parts . . . no evidence of the specific type of weapon used . . . no evidence of the specific type of wound inflicted on the victim . . . and no evidence of prior planning, preparation or motive." (Citations omitted.) *State* v. *Sivri*, supra, 231 Conn. 127.

Additionally, in that case, the state's forensic scientist was unable to determine what caused the victim's death. Id., 123. Nevertheless, the court concluded that the circumstantial evidence and reasonable inferences drawn therefrom were sufficient to support the jury's finding that the defendant, in fact, caused the victim's death. Id., 129–30.

By contrast, in the present case, despite the fact that there was no evidence of a murder weapon, there *was* evidence, unlike in *Sivri*, of prior planning, preparation, and motive, and there *were* body parts found in close proximity to the defendant's residence shortly after the victim was last seen alive in the company of the defendant. Lastly, unlike in *Sivri*, there was testimony from the chief medical examiner that the cause of death was "homicidal violence."

In sum, it would have been reasonable for the jury to find that the defendant was a domestic abuser whose violence against the victim escalated as her desire to end their relationship became more apparent to him. That conclusion is supported by the following evidence presented to the jury: (1) the defendant was a controlling boyfriend who always wanted to know the whereabouts of the victim; (2) he followed and stalked her several times over the course of their relationship; (3) the victim wanted to break up with the defendant but was unsure how; (4) the defendant and the victim got into an argument one month before she disappeared and, at that time, the defendant choked the victim and threw her; (5) the defendant told Wright that, because he was a nurse, he knew how to get rid of the victim and, shortly thereafter, he choked her because he was "upset"; (6) he was the last person to be seen with the victim prior to her disappearance; (7) the victim tried to break up with the defendant on April 20, 2013; (8) he removed the bathtub, sink, and counter from his Ansonia residence; (9) he had his car detailed in order to remove any DNA evidence of the victim; and (10) the defendant placed some of the victim's personal belongings in a garbage bag in his basement in order to throw them out at a later date and time. From these facts, the jury reasonably could have concluded that the defendant murdered the victim at or around 4 p.m. on April 20, 2013, the day she went missing, and that the defendant severed the limbs of the victim and placed a portion of her remains 1.5 miles from his Bridgeport residence.

During oral argument before this court, counsel for the defendant set forth possible alternatives as to why several of the facts adduced during the state's case-in-chief do not lead to the conclusion that the defendant committed murder. We are reminded, however, of our scope of review: "[W]e give deference not to the hypothesis of innocence posed by the defendant, but to the evidence and the reasonable inferences drawable there-

from that support the jury's determination of guilt. On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." *State* v. *Sivri*, supra, 231 Conn. 134. Mindful of our standard of review, which requires us to view the evidence in the light most favorable to sustaining the jury's verdict, we reject the defendant's claim and conclude that the evidence was sufficient to sustain a conviction of murder.

II

Next, the defendant claims that the court erred in not giving, sua sponte, a special credibility instruction with regard to a witness who testified under a cooperation agreement. Specifically, the defendant posits that a special credibility instruction, similar to that which is given for a jailhouse informant who has been promised a benefit for his testimony, is warranted in cases in which a witness does not testify in the first trial but does so in subsequent trials.[8] Despite not raising this matter before the trial court, the defendant asks this court to conclude that the court's failure sua sponte to provide the instruction amounted to plain error pursuant to Practice Book § 60-5. In response, the state contends that the factual predicate for the defendant's claim and proposed rule, namely, that Wright did not testify in all three trials, was not supported by the record as it reflects that Wright did, indeed, testify in all three trials. The state claims, therefore, that because the linchpin of the defendant's claim—that Wright only testified in the third trial—is unsupported, we should summarily reject this claim.

From our review of the record and at oral argument before this court, it appears that the defendant, when confronted with the fact that Wright testified in all three trials, shifted his argument to urge this court, on the basis of plain error, to adopt an instructional rule to apply whenever a witness for the state who is on probation testifies. The defendant's claim is based on the notion that the incentive for a person on probation is sufficiently similar to one who is still in custody and, therefore, the special credibility charge given by the court regarding jailhouse informants should apply equally to probationers. In response to this claim, the state argues that the defendant is not entitled to reversal under the plain error doctrine because there was no error or manifest injustice resulting from the court's failure to give such an instruction as a result of the fact that the court gave a general instruction on credibility. We agree with the state.

We begin by setting forth the relevant legal principles. Generally, claims not raised in the court below are not ripe for review by this court; however, "[t]he plain error doctrine . . . is an extraordinary remedy used by

appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review." (Internal quotation marks omitted.) *State* v. *Diaz*, 302 Conn. 93, 101, 25 A.3d 594 (2011). "[Previously], [our Supreme Court] described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) *State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017).

"With respect to the first prong, the claimed error must be patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . With respect to the second prong, an appellant must demonstrate that the failure to grant relief will result in manifest injustice. . . . [Our] Supreme Court has described that second prong as a stringent standard that will be met only upon a showing that, as a result of the obvious impropriety, the defendant has suffered harm so grievous that fundamental fairness requires a new trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson*, 178 Conn. App. 16, 20–21, 173 A.3d 974 (2017), cert. denied, 327 Conn. 998, 176 A.3d 557 (2018).

The defendant appears to argue that it was plain error for the court not to give a special credibility instruction because the defendant and Wright were both, in some manner, in the care and custody of the Commissioner of Correction—the defendant in physical custody pending the outcome of the trial and Wright as a probationer. The defendant, therefore, in essence, argues that because both he and Wright were under the control of the commissioner, the court should have given an instruction modeled after that given for confidential informants. Our case law does not support such a conclusion.

"Generally, a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely. . . . [Our Supreme Court] has held, however, that a special credibility instruction is required for three types of witnesses, namely, complaining witnesses, accomplices and jailhouse informants. . . . Typically, a jailhouse informant is a prison inmate who has testified about confessions or inculpatory statements made to him by a fellow inmate . . . . The rationale for requiring a special credibility instruction for jailhouse informants is that an informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self-interest, to implicate falsely the accused." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Diaz*, supra, 302 Conn. 101–102.

As the state correctly points out, Wright does not fall within any of the categories of witnesses requiring a special credibility instruction as provided by our Supreme Court. Specifically, Wright was not a complaining witness, nor was he an accomplice. Additionally, Wright, as conceded by the defendant, was not an informant. The defendant, however, argues that an individual on probation is in a similar situation as that of an incarcerated witness and, thus, has a powerful incentive to testify falsely. The defendant asks this court to craft a rule requiring a special credibility instruction applicable to probationers akin to the rule for jailhouse informants. We decline to do so.

To characterize someone on probation as being in the same light as an incarcerated individual interprets too broadly the categories of witnesses identified by our Supreme Court in *Diaz*. Additionally, even if we were to decide that a witness on probation required a special credibility instruction, "[our Supreme Court] . . . has held that the trial court's failure to give . . . [such an] instruction . . . does not constitute plain error when the trial court has instructed the jury on the credibility of witnesses and the jury is aware of the witness' motivation for testifying." *State* v. *Diaz*, supra, 302 Conn. 103.

During Wright's testimony, in the present case, the jury learned that he was twice arrested for stealing from his employer. The jury also learned that Wright was testifying pursuant to a plea agreement in which he would not be sent to prison for his crimes so long as he cooperated with the state in the prosecution of the defendant. Additionally, the jury heard from Wright that this was his third time testifying against the defendant. The court, without objection from the defendant, gave the jury a general credibility instruction.[9] Lastly, the court, also without objection, gave a credibility instruction with regard to Wright as an individual with a criminal record.[10] Upon our review of the foregoing, and

as our Supreme Court concluded in *Diaz*, we do not conclude that the court's failure to give a special credibility instruction in the present case "constitute[d] an error that was so obvious that it affect[ed] the fairness and integrity of and public confidence in the judicial proceedings, or of such monumental proportion that [it] threaten[ed] to erode our system of justice and work a serious and manifest injustice on the aggrieved party." (Internal quotation marks omitted.) *State* v. *Diaz*, supra, 302 Conn. 104.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The first two trials, in 2015 and 2016, ended in hung juries.

[2] The defendant also claims that his third trial violated his right to due process under our state's constitution and the federal constitution because the state had twice previously failed to meet its burden of proof. More specifically, the defendant argues that successive prosecutions ought to be barred when the state fails to meet its burden because jeopardy attaches once a jury is sworn in and there is no manifest necessity to declare a mistrial when a jury cannot reach a unanimous verdict. The defendant's position essentially asks this court to determine how many times the state can be allowed to prosecute the defendant for the same crime, following a hung jury, before his rights have been violated. It is well established by our Supreme Court and the United States Supreme Court that a mistrial following a hung jury does not terminate original jeopardy; thus, a subsequent trial does not violate the Connecticut or federal constitutional prohibition against double jeopardy. See *Richardson* v. *United States*, 468 U.S. 317, 326, 104 S. Ct. 3081, 82 L. Ed. 2d 242 (1984) ("[A] trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which [the defendant] was subjected. . . . [J]eopardy does not terminate when the jury is discharged because it is unable to agree."); *State* v. *James*, 247 Conn. 662, 673–74, 725 A.2d 316 (1999) ("It is axiomatic that a mistrial required by the manifest necessities of the case does not terminate jeopardy. . . . The jury's inability to reach a unanimous verdict on a count may compel the trial court to declare a mistrial . . . ." (Citations omitted.)). In the present case, the defendant was charged three times with murder. At the completion of each of the first two trials, the jury was unable to give a unanimous verdict, prompting the court to declare a mistrial. We decline to fashion a rule that identifies the specific number of times a defendant can be charged, following the failure of the jury to reach a unanimous verdict, before successive prosecutions would become unconstitutional. Therefore, in accordance with federal and Connecticut jurisprudence, we conclude that, in the present case, the state's third attempt to prosecute the defendant was not a violation of the federal or the Connecticut constitutions. Accordingly, this claim fails.

[3] Because the victim's sister and the sister's husband, Dumar Landell, both share the same last name, both will be referred to by their first name throughout this opinion.

[4] "Facebook is a social networking website that allows private individuals to upload photographs and enter personal information and commentary on a password protected profile." (Internal quotation marks omitted.) *State* v. *Kukucka*, 181 Conn. App. 329, 334 n.3, 186 A.3d 1171, cert. denied, 329 Conn. 905, 184 A.3d 1216 (2018).

[5] There was evidence that the defendant, as a licensed practical nurse, had taken courses in anatomy and biology as part of his training. Although this educational information does not bear directly on his knowledge of how to sever body parts, it is some indication that his knowledge of human anatomy was enhanced by his specialized education.

[6] We note with concern that, in its brief, the state made the following assertion: "[n]o blood or DNA was found in either location despite the fact that, at least with respect to the Bridgeport residence, the victim had been a regular visitor." This assertion is misleading based upon our careful review of the trial transcript. The detective and the crime scene technician who processed the scene testified that they searched for evidence of blood and found none. They did not testify that they searched for or tested other biological samples and no lab reports were admitted into evidence that

suggested any items in the residence were tested for the presence of human DNA.

7 The defendant moved for a judgment of acquittal at the close of the state's evidence, arguing that no reasonable juror could convict him with the evidence presented. The court, however, denied the motion from the bench. The defendant did not renew his motion at the close of all the evidence.

8 Jevene Wright, the cooperating witness at issue in the defendant's claim, pleaded guilty to larceny in the first degree for theft of $1.4 million from his employer and $76,000 from another employer. Wright agreed to a suspended sentence and probation in exchange for his truthful testimony against the defendant.

9 The court's general credibility instruction provided: "I want to discuss the subject of credibility by which I mean the believability of testimony. You have observed the witnesses. The credibility, the believability of the witnesses and the weight to be given to their testimony are matters entirely within your hands. It is for you alone to determine their credibility. Whether or not you find a fact proven is not to be determined by the number of witnesses testifying for or against it. It is the quality not the quantity of the testimony which should be controlling, nor is it necessarily so that because a witness testifies to a fact and no one contradicts it you are bound to accept that fact as true. The credibility of the witness and the truth of the fact is for you to determine.

"In weighing testimony of the witnesses, you should consider the probability or improbability of their testimony. You should consider their appearance, conduct and demeanor while testifying in court and any interest, bias, prejudice or sympathy which a witness may apparently have for or against the state or the accused or in the outcome of the trial. With each witness you should consider his or her ability to observe facts correctly, recall them and relay them to you truly and accurately. You should consider whether and to what extent witnesses needed their memories refreshed while testifying. You should, in short, size up the witnesses and make your own judgment as to their credibility and decide what portion, all, some or none of any particular witness' testimony you will believe based on these principles. . . . In short, you should bring to bear upon the testimony of the witnesses the same considerations and use the same sound judgment you apply to questions of truth and veracity as they present themselves to you in everyday life.

"You are entitled to accept any testimony which you believe to be true and to reject either wholly or in part the testimony of any witness you believe has testified untruthfully or erroneously. The credit that you will give to the testimony offered is, as I have told you, something which you alone must determine. Where a witness testifies inaccurately and you either do or do not think that the inaccuracy was consciously dishonest, you should keep that in mind and scrutinize the whole testimony of that witness. The significance you attach to it may vary more or less with a particular fact as to which the inaccuracy existed or with the surrounding circumstances. You should bear in mind that people sometimes forget things. On the other hand, if a witness has intentionally testified falsely you may disregard the witness' entire testimony but you are not required to do so. It is up to you to accept or reject all or any part of any witness' testimony."

10 The credibility instruction given with regard to Wright as a witness with a criminal record provided: "The evidence that one of the state witnesses, Jevene Wright, was previously convicted twice of a crime of larceny in the first degree, that [Wright] has admitted to stealing and lying is only admissible on the question of the credibility of a witness, that is the weight that you will give the witness' testimony. The witness' criminal record and or admission of acts of stealing and lying bears only on the witness' credibility. It is your duty to determine whether this witness is to be believed wholly or partly or not at all. You may consider the witness' prior convictions and acts of stealing and lying and weigh the credibility of this witness and give such weight to those facts that you decide is fair and reasonable in determining the credibility of this witness."

_____